Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | WILLIAM T. HART | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 7538 | **DATE** | MAY 29 , 2002 |
| **CASE TITLE** | IRENE ABRAMS, etc., et al. v. VAN KAMPEN FUNDS, INC., et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]



**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Plaintiffs' motion for reconsideration is granted. The Memorandum Opinion and Order dated May 16, 2002 is vacated. Defendants' motion to dismiss [20-1] is granted in part and denied in part. Count IV is dismissed in part without prejudice to the extent it contains a claim based on the overcharging of management fees because of inflated values. Defendants shall answer the complaint on or before June 12, 2002.

(11) ■ [For further detail see order attached to the original minute order.]

| | |
|---|---|
| ✓ | No notices required, advised in open court. |
| | No notices required. |
| | Notices mailed by judge's staff. |
| | Notified counsel by telephone. |
| | Docketing to mail notices. |
| | Mail AO 450 form. |
| | Copy to judge/magistrate judge. |

number of notices

MAY 3 0 2002
date docketed

docketing deputy initials

date mailed notice

courtroom
deputy's
initials
cw

U.S. DISTRICT COURT

01 C W 29 PM 3:10

Date/time received in
central Clerk's Office

mailing deputy initials

Document Number

31

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

IRENE ABRAMS, on behalf of          )
herself and all others             )
similarly situated,                )
                                   )          **DOCKETED**
            Plaintiffs,            )
                                   )          **MAY 3 0 2002**
      v.                           )    No. 01 C 7538
                                   )
VAN KAMPEN FUNDS, INC.,            )
VAN KAMPEN INVESTMENT ADVISORY     )
CORPORATION, VAN KAMPEN PRIME      )
RATE INCOME TRUST, HOWARD TIFFEN,  )
RICHARD F. POWERS, III, STEPHEN L. )
BOYD, DENNIS J. McDONNELL,         )
and JEFFREY W. MAILLET,            )
                                   )
            Defendants.            )


## MEMORANDUM OPINION AND ORDER


        This is a consolidated putative class action alleging

federal securities violations involving defendant Van Kampen

Prime Rate Income Trust's (the "Fund") valuation of senior loans

and is subject to the Private Securities Litigation Reform Act of

1995 ("PSLRA"), 15 U.S.C. § 77z-1.[1]  The court appointed lead

_____

        [1]The opinion dated May 16, 2002 mistakenly relied on
15 U.S.C. § 78u-4, which applies to claims under the Securities
Exchange Act of 1934.  Plaintiffs' claims are all under the
Securities Act of 1933, which contains 15 U.S.C. § 77z-1.
Though § 77z-1 and § 78u-4 are similar, § 77z-1 does not have
a subsection corresponding to the pleading requirements of
§ 78u-4(b).  The May 16, 2002 Memorandum Opinion and Order is
vacated and replaced by today's Memorandum Opinion and Order.

plaintiffs and approved lead counsel. The Consolidated Amended Complaint (the "Complaint") proposes a class consisting of "all persons who purchased or otherwise acquired shares ('common stock' or 'shares') of Van Kampen Prime Rate Income Trust between September 30, 1998 and March 26, 2001." Named as defendants are the Fund; Van Kampen Funds, Inc. ("Van Kampen"), the Fund's administrator; Van Kampen Investment Advisory Corp. (the "Adviser"), the Fund's investment adviser; Richard Powers, Fund Chairman of the Board, President, and Trustee; Dennis McDonnell, former Fund Chairman of the Board, President, and Trustee; Stephen Boyd, Fund Executive Vice President and Chief Investment Officer and Adviser Officer; Howard Tiffen, Fund Portfolio Manager and Adviser Officer; and Jeffrey Maillet, former Portfolio Manager and Adviser Officer. The counts of the Complaint are labeled as (I) a violation of § 11 of the Securities Act, 15 U.S.C. § 77k, against Van Kampen, the Fund, Powers, McDonnell, and Boyd; (II) a violation of § 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), against the Fund; (III) control person liability under § 15 of the Securities Act, 15 U.S.C. § 77o, for the violations of sections 11 and 12 against Van Kampen and the Adviser; and (IV) a state law breach of fiduciary duty claim against all defendants except the Fund.[2]

---

[2]The Complaint does not contain allegations as to the citizenship of all defendants and there is no contention that Count IV would be properly before the court on diversity

Presently pending is defendants' Fed. R. Civ. P. 12(b)(6)
motion to dismiss.  Defendants contend that the facts alleged and
of which judicial notice may be taken show that the securities
law claims were filed after the applicable one-year limitation
period.  Alternatively, defendants contend the securities law
claims fail on their merits because plaintiffs do not allege a
material misrepresentation or omission or because either the
necessary scienter is not alleged or fraud is not alleged with
the specificity required by Fed. R. Civ. P. 9(b).  As to
Count IV, defendants contend it should be dismissed for lack of
jurisdiction if all the federal claims are dismissed or, if the
merits are reached, because the claim alleged may only be brought
as a derivative action on behalf of the Fund, not directly by
plaintiffs.

On a Rule 12(b)(6) motion to dismiss, plaintiffs'
well-pleaded allegations of fact are taken as true and all
reasonable inferences are drawn in plaintiffs' favor.
Leatherman v. Tarrant County Narcotics Intelligence &
Coordination Unit, 507 U.S. 163, 164 (1993); Stachon v. United
Consumers Club, Inc., 229 F.3d 673, 675 (7th Cir. 2000).
Ordinarily, a complaint need not set forth all relevant facts

jurisdiction.  It is assumed that Count IV is before this court
based only on supplemental jurisdiction.  See 28 U.S.C. § 1367.

or recite the law; all that is required is a short and plain statement showing that the party is entitled to relief. Fed. R. Civ. P. 8(a); Anderson v. Simon, 217 F.3d 472, 474 (7th Cir. 2000), cert. denied, 531 U.S. 1073 (2001); Scott v. City of Chicago, 195 F.3d 950, 951 (7th Cir. 1999); Doherty v. City of Chicago, 75 F.3d 318, 322 (7th Cir. 1996). Ordinarily, a plaintiff in a suit in federal court need not plead facts; conclusions may be pleaded as long as the defendant has at least minimal notice of the claim. Fed. R. Civ. P. 8(a)(2); Scott, 195 F.3d at 951; Albiero v. City of Kankakee, 122 F.3d 417, 419 (7th Cir. 1997); Jackson v. Marion County, 66 F.3d 151, 153-54 (7th Cir. 1995). However, to the extent fraud is alleged, it must be specifically pleaded. See Fed. R. Civ. P. 9(b).

As to affirmative defenses such as the statute of limitations, it is unnecessary to plead facts that would negate the affirmative defense. Alvarado v. Litscher, 267 F.3d 648, 651-52 (7th Cir. 2001); Tregenza v. Great American Communications Co., 12 F.3d 717, 718 (7th Cir. 1993), cert. denied, 511 U.S. 1085 (1994); Wade v. Henderson, 2002 WL 15697 *1 (N.D. Ill. Jan. 4, 2002). It is also true, however, that a plaintiff can plead himself or herself out of court by alleging facts showing there is no viable claim. Kauthar SDN BHD v. Sternberg, 149 F.3d 659, 669-70 & n.14 (7th Cir. 1998), cert. denied, 525 U.S. 1114 (1999); Whirlpool Financial Corp. v. GN Holdings, Inc., 67 F.3d

605, 608 (7th Cir. 1995); <u>Jackson</u>, 66 F.3d at 153-54; <u>Tregenza</u>,
12 F.3d at 718; <u>Wafra Leasing Corp. 1999-A-1 v. Prime Capital
Corp.</u>, 192 F. Supp. 2d 852, 860 (N.D. Ill. 2002).

 Without converting a motion to dismiss to one for summary
judgment, judicial notice may be taken of historical documents,
documents contained in the public record, and reports, decisions,
and regulations of administrative bodies.  <u>Anderson</u>, 217 F.3d
at 474-75; <u>Menominee Indian Tribe of Wisconsin v. Thompson</u>,
161 F.3d 449, 456 (7th Cir. 1998), <u>cert. denied</u>, 526 U.S. 1066
(1999); <u>Northgate Motors, Inc. v. General Motors Corp.</u>, 111
F. Supp. 2d 1071, 1077 (E.D. Wis. 2000); <u>Demick v. City
of Joliet</u>, 108 F. Supp. 2d 1022, 1025 (N.D. Ill. 2000).  Further,
documents that are referred to in the complaint and that are
central to a claim that is made may be considered even if not
attached to the complaint.  <u>Duferco Steel Inc. v. M/V Kalisti</u>,
121 F.3d 321, 324 n.3 (7th Cir. 1997); <u>Venture Associates
Corp. v. Zenith Data Systems Corp.</u>, 987 F.2d 429, 431 (7th Cir.
1993); <u>Hebein ex rel. Berman v. Young</u>, 37 F. Supp. 2d 1035,
1038-39 (N.D. Ill. 1998).  This includes the full text of SEC
filings, prospectuses, analysts' reports, and statements that are
integral to the complaint.  <u>Bovee v. Coopers & Lybrand C.P.A.</u>,
272 F.3d 356, 360-61 (6th Cir. 2001); <u>Ehlert v. Singer</u>, 245 F.3d
1313, 1316 n.4 (11th Cir. 2001); <u>San Leandro Emergency Medical
Group Profit Sharing Plan v. Philip Morris Cos.</u>, 75 F.3d 801,

808-09 (2d Cir. 1996); In re Newell Rubbermaid Inc. Securities Litigation, 2000 WL 1705279 *3 n.2 (N.D. Ill. Nov. 14, 2000); Nielsen v. Greenwood, 849 F. Supp. 1233, 1248-49 (N.D. Ill. 1994). Moreover, actual documents will override inconsistent descriptions of those documents alleged in the body of the complaint. See In re Wade, 969 F.2d 241, 249 (7th Cir. 1992); Beam v. IPCO Corp., 838 F.2d 242, 244-45 (7th Cir. 1988).

Ordinarily, as long as they are consistent with the allegations of the complaint, a plaintiff may assert additional facts in its response to a motion to dismiss. Brokaw v. Mercer County, 235 F.3d 1000, 1006 (7th Cir. 2000); Forseth v. Village of Sussex, 199 F.3d 363, 368 (7th Cir. 2000); Albiero, 122 F.3d at 419; Gutierrez v. Peters, 111 F.3d 1364, 1367 n.2 (7th Cir. 1997); Hrubec v. National Railroad Passenger Corp., 981 F.2d 962, 963-64 (7th Cir. 1992). However, Rule 9(b) requires that certain allegations be in the complaint. As to allegations of fraud, misleading statements or omissions, and state of mind, the allegations must be in the complaint and cannot be supplemented by additional allegations contained in the answer to the motion to dismiss.

The Fund is a non-diversified, closed-end management investment company with the investment objective of providing "a high level of current income, consistent with preservation of capital." It primarily invests in floating or variable rate

senior loans to United States corporations, partnerships, and other entities.  It has been operating since October 1989.  The Fund operates as an interval fund, which means it continually sells shares to the public, but shares are repurchased only once per quarter at net asset value ("NAV").  NAV is computed by calculating the total value of the Fund's securities and other assets, less liabilities, and dividing the result by the number of shares outstanding.  An important component of calculating NAV is determining the value of the loans held by the Fund.  Under SEC Rule 2a-4, where market quotations are readily available, securities shall be valued accordingly.  However, where there are no readily available market quotations, the Fund's trustees are to make a good faith determination of fair value, which is the amount which the owner might reasonably expect to receive if the asset were sold.

When the Fund began operating in 1989, few readily available quotes were available for the loans held by the Fund. During the 1990's, however, a secondary market developed for senior loans.  It is alleged in the Complaint that, by the mid-1990's, some senior loan funds began valuing loans based solely on market quotations.  From 1991 to 1998, secondary loan trading increased twelvefold, with total traded loan value in 1998 exceeding $110 billion.  In late 1999, the SEC sent a letter to the Investment Company Institute, of which the Fund is a member,

expressing concern that senior loan funds were not properly valuing their loans. Soon thereafter, reports circulated in the financial press raising concerns that some senior loan funds were delaying conversion to market pricing because it would result in a substantial decrease in the funds' NAVs.

Plaintiffs allege that the Fund did not begin the conversion to market pricing until late 1999 even though market quotations for all or most of the loans held by the Fund had already been readily available since 1998 and earlier. Defendants allegedly decided to gradually convert valuation of the Fund's loans to market pricing. According to the Complaint, in the first quarter of 2000, approximately one-third of the Fund's loans were valued using market prices instead of the fair value method.

The Fund first offered shares to the public at a share price or NAV of $10.00. From 1989 until mid-1999, the NAV had never fluctuated more than five to ten cents from ten dollars. As of September 20, 1998 (the beginning of the proposed class period), the Fund's NAV was $9.96. Over the next twelve months it was at a high of $9.97 and a low of $9.87, which was as of August 1999.[3] However, when the gradual change in valuing methodology began in the fourth quarter of 1999, the NAV began

_____

[3]Inconsistent with this allegation of the Complaint, the Fund's prospectuses and reports show the NAV was lower on July 31, 1999, when it was $9.85.

dropping. By the end of the proposed class period in March 2001, the Fund's NAV was $8.82.

Plaintiffs allege three specific examples of allegedly improper valuation using the fair value method instead of market pricing. See Complaint ¶ 45. On an unspecified date during the proposed class period, a $55 million loan to Vencor Inc., "a troubled hospital operator," was valued at $52.7 million or 95 cents on the dollar, even though it was selling at 70 cents on the dollar on the senior loan market. As of July 31, 1999, a $65 million loan to now-bankrupt Iridium Operating LLC was valued at 90 cents on the dollar even though it was selling at just under 70 cents on the dollar in the senior loan market. As of June 30, 2000, the Fund valued a $46 million loan to U.S. Office Products at 95 cents on the dollar while Loan Pricing Corp. quoted it at 70 cents on the dollar. It is also generally alleged that defendants, and specifically the Adviser, failed to follow SEC and the Fund's guidelines for fairly valuing the loans. Instead, both prior to and during the proposed class period, defendants engaged "in an effort to falsely maintain a relatively stable, albeit inflated, NAV and false impression that the objective of 'preservation of capital' was being met." Complaint ¶ 51. Specifically, defendants generally ignored the financial conditions of the borrowers and instead tended to value loans at par.

Plaintiffs allege that the NAV of the Fund had been materially inflated during the proposed class period because of the overvaluation of many loans. By January 31, 2001, 80% of the Fund's loans were being valued through market pricing, with a corresponding decrease in NAV from a previously stable amount near $10 to $8.82. It is alleged that the registration statements and prospectuses that were pending during the proposed class period were materially false and misleading in that they contained an inflated NAV. It is also alleged that the registrations statements and prospectuses were "materially misleading because their stated investment objective of 'preservation of capital' had not been and could not be maintained without falsely reporting an inflated NAV." It is further claimed that the quarterly repurchases at "materially inflated" valuations diluted the value of the shares of remaining investors. Complaint ¶ 47.

It is alleged that the NAV remained stable despite changing market conditions.

> 53. For example, throughout 1998, the Fund's NAV remained remarkably stable, within a few pennies of $10. However, in 1998 there were significant market gyrations, not the least of which involved an eroding debt market, the Asian Financial Crisis, the Long Term Capital debacle, near record loan defaults, and a reportedly depressed market for publicly traded loan funds. In fact, in 1998, Merrill Lynch Asset Management abandoned plans to complete an initial public offering of an exchange traded loan fund. In announcing its plans, a Merrill Lynch spokeswoman

was quoted as saying that, "[m]arket conditions
prevented us from issuing the fund in 1998."
Yet, despite all of these factors, which
negatively affected the market value of the
Fund's Loan interests, the Fund's NAV never
waivered, serving as strong evidence that the
Fund was not making "fair value" determinations
in accordance with the "current sale" rule
under ASR 118 and its own stated valuation
considerations.  The Fund's valuation
determinations were thus not in good faith,
which in addition to leading to materially
inflated NAVs also constituted a breach of the
Individual Defendants' fiduciary duties to
plaintiffs and the Class.
         54.  In sum, defendants failed to adopt and
employ "mark to market" pricing procedures for
the Fund's interest in the senior loan interests
of the Portfolio, despite the existence of
"readily available" market quotations, or, in the
alternative, failed to determine in good faith
the "fair value" of the Fund's senior loan
interests, considering all indications in value
in respect of a "current sale." . . .

Complaint ¶¶ 53(2d)-54.[4]

The original complaint in this case was filed on

September 28, 2001.  The present Complaint was filed on

January 7, 2002.  As to discovery of their claims, plaintiffs

allege:

         At the time they purchased Fund shares,
plaintiffs and the other members of the Class
were without knowledge of the facts concerning
the wrongful conduct alleged herein and could not
have reasonably discovered those facts prior to
the end of the Class Period.  Less than one year
has elapsed from the time that plaintiffs

_____

[4]The Complaint contains two sets of paragraphs numbered
51 through 53.  Herein, the second set of paragraphs is referred
to as 51(2d), 52(2d), and 53(2d).

> discovered or reasonably could have discovered
> the facts upon which the Consolidated Amended
> Complaint is based to the time that plaintiffs
> filed the Consolidated Amended Complaint. Less
> than three years have elapsed from the time that
> the shares upon which the claim is brought were
> bona fide offered to the public to the time
> plaintiffs filed the Consolidated Amended
> Complaint.

Complaint ¶ 66.

To state a claim under section 11 or section 12(a)(2) of the Securities Act, plaintiffs must allege that defendant is responsible for untrue statements of material fact or omitted material facts in a registration statement or prospectus.[5] See Herman & MacLean v. Huddleston, 459 U.S. 375, 381-82 (1983); Harden v. Raffensperger, Hughes & Co., 65 F.3d 1392, 1399-1400 (7th Cir. 1995); In re Newell Rubbermaid Inc. Securities Litigation, 2000 WL 1705279 *7 (N.D. Ill. Nov. 14, 2000); Danis v. USN Communications, Inc., 121 F. Supp. 2d 1183, 1188 (N.D. Ill. 2000); In re Nanophase Technologies Corp. Litigation, 1999 WL 965468 *5 (N.D. Ill. Sept. 30, 1999); In re First Merchants Acceptance Corp. Securities Litigation, 1998 WL 781118 *11 (N.D. Ill. Nov. 4, 1998). Neither statute contains a scienter or reliance requirement, instead making persons in certain positions absolutely liable for the material and misleading statements unless they can affirmatively make certain

---

[5]Section 12(a)(2) also applies to oral communications, but plaintiffs do not allege any oral communications.

showings as to their knowledge and diligence. Herman, 459 U.S. at 382; Pacific Dunlop Holdings Inc. v. Allen & Co., 993 F.2d 578, 580, 594 (7th Cir. 1993), cert. dismissed, 510 U.S. 1160 (1994), overruled on other grounds, Gustafson v. Alloyd Co., 513 U.S. 561 (1995); Newell, 2000 WL 1705279 at *7; Harden v. Raffensperger, Hughes & Co., 933 F. Supp. 763, 766 (S.D. Ind. 1996); Schwitters v. Tomlinson, 1996 WL 54240 *6 (N.D. Ill. Feb. 9, 1996); Cashman v. Coopers & Lybrand, 877 F. Supp. 425, 435 (N.D. Ill. 1995). A misstatement is material if there is a substantial likelihood that it would be viewed by a reasonable investor as significantly altering the total mix of available information and thus important to the investor's decision to invest. TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976); Astor Chauffeured Limousine Co. v. Runnfeldt Investment Corp., 910 F.2d 1540, 1546-47 (7th Cir. 1990); Newell, 2000 WL 1705279 at *7; Danis, 121 F. Supp. 2d at 1188; Nielsen v. Greenwood, 1996 WL 563539 *14 (N.D. Ill. Oct. 1, 1996); Whirlpool Financial Corp. v. GN Holdings, Inc., 873 F. Supp. 111, 121-22 (N.D. Ill.), aff'd, 67 F.3d 605 (7th Cir. 1995). As a general rule, the determination of materiality presents factual issues that cannot be resolved on a motion to dismiss. Marks v. CDW Computer Centers, Inc., 122 F.3d 363, 370 (7th Cir. 1997). However, if it can be determined that the misstatement was not important and a reasonable investor could not possibly have been

swayed by the alleged misstatement, it may be determined as a matter of law that the misstatement was not material.  Newell, 2000 WL 1705279 at *7; Danis, 121 F. Supp. 2d at 1188; Endo v. Albertine, 863 F. Supp. 708, 717 (N.D. Ill. 1994).

Defendants contend that the pleading requirements of Rule 9(b) apply to the federal claims because, even if fraud is not a necessary element of the claims, plaintiffs' allegations sound in fraud.  The Seventh Circuit has not ruled on the issue and it is recognized that the case law is split.  However, this court agrees with those courts that have held that the pleading requirements for fraud do not apply to a claim for which fraud is not an element.  See In re NationsMart Corp. Securities Litigation, 130 F.3d 309, 315 (8th Cir.), cert. denied, 524 U.S. 927 (1998); Danis v. USN Communications, Inc., 73 F. Supp. 2d 923, 932 (N.D. Ill. 1999); First Merchants, 1998 WL 781118 at *11 & n.6; In re CINAR Corp. Securities Litigation, 186 F. Supp. 2d 279, 307 (E.D.N.Y. 2002).

A one-year limitation period applies to plaintiffs' securities claims.  See 15 U.S.C. § 77m; Whirlpool, 67 F.3d at 609.  Defendants contend that plaintiffs had sufficient notice of the alleged misstatements by September 20, 2000 or earlier, that is more than a year prior to the filing of the original complaint.  They base this contention on (a) disclosures in the prospectuses, semiannual reports, and annual reports as to the

valuation methodology being used; (b) declines in the Fund's NAV
from late 1999 through September 2000; (c) stable NAV's in 1998
despite the alleged existence of significant market gyrations;
and (d) the SEC letter in 1999 and the press reports that
followed.

For plaintiffs' securities claims, the one-year
limitation period accrues upon actual notice or "inquiry notice"
of the claim, whichever comes first. Kauthar, 149 F.3d at 670;
Whirlpool, 67 F.3d at 609; Tregenza, 12 F.3d at 721-22;
DeBruyne v. Equitable Life Assurance Society of United States,
920 F.2d 457, 466 (7th Cir. 1990). "Inquiry notice starts the
running of the statute of limitations 'when the victim of the
alleged fraud became aware of the facts that would have led a
reasonable person to investigate whether he might have a claim.'"
Whirlpool, 67 F.3d at 609 (quoting Tregenza, 12 F.3d at 718).
Accord Kauthar, 149 F.3d at 670. "However, more than 'merely
suspicious circumstances' must exist; instead the plaintiff must
learn of a circumstance that places him 'in possession of, or
with ready access to, the essential facts that he needs in order
to be able to sue.'" Kauthar, 149 F.3d at 670 (quoting Fujisawa
Pharmaceutical Co. v. Kapoor, 115 F.3d 1332, 1337 (7th Cir.
1997)). "Inquiry notice 'does not begin to run unless and until
the investor is able, with the exercise of reasonable diligence
(whether or not actually exercised), to ascertain the information

needed to file suit.'" Kauthar, 149 F.3d at 671 n.15 (quoting
Marks, 122 F.3d at 368). The standard to be applied is an
objective one, Whirlpool, 67 F.3d at 609; Scott v. Steingold,
1999 WL 618109 *4 (N.D. Ill. Aug. 9, 1999); the particular
plaintiff's level of intelligence or financial sophistication is
not considered. Mathews v. Kidder, Peabody & Co., 260 F.3d 239,
251 (3d Cir. 2001); Great Rivers Cooperative of Southeastern
Iowa v. Farmland Industries, Inc., 120 F.3d 893, 898 (8th Cir.
1997); Dodds v. Cigna Securities, Inc., 12 F.3d 346, 350 (2d Cir.
1993), cert. denied, 511 U.S. 1019 (1994); In re NAHC, Inc.
Securities Litigation, 2001 WL 1241007 *8 (E.D. Pa. Oct. 17,
2001); Cosmos Import & Export Ltd. v. Merrill Lynch, Pierce
Fenner & Smith, Inc., 1997 WL 328068 *5 (S.D.N.Y. June 16, 1997);
In re Prudential Insurance Co. of America Sales Practices
Litigation, 975 F. Supp. 584, 601 (D.N.J. 1996); Rebenstock v.
Deloitte & Touche, 907 F. Supp. 1059, 1063 (E.D. Mich. 1995).

In the present case, it must be kept in mind that the
section 11, 12, and 15 claims that are made do not require proof
of scienter. Thus, the present case is distinguishable from Rule
10b-5 claims where the plaintiff must also have sufficient facts
supporting inquiry notice as to fraudulent intent on a
defendant's part before the plaintiff has knowledge of all the
facts necessary to file suit. See Law v. Medco Research, Inc.,
113 F.3d 781, 785-86 (7th Cir. 1997); Wafra, 192 F. Supp. 2d at

861.  In the present case, there need only be inquiry notice that

a registration statement or prospectus contained a material and

untrue fact.  See Law, 113 F.3d at 785-86.  Central to

plaintiffs' alleged misstatements is whether the NAV was being

overstated.  It must be determined whether, based on the facts

alleged (as well as those facts that may otherwise be considered

on a motion to dismiss), it can only be concluded that plaintiffs

were on inquiry notice as to the inflated NAV.

The Fund's prospectuses and registration statements

(which incorporate the prospectuses), as well as annual and

semiannual reports that were mailed to shareholders, disclosed

the Fund's valuation policy.  For example, the June 21, 1999

prospectus provides:

> The value of the Fund's portfolio will be
> determined by the Adviser, following guidelines
> established and periodically reviewed by the
> Trustees.  Interests in Senior Loans will be
> valued by the Adviser on behalf of the Fund on
> the basis of market quotations and transactions
> in instruments which the Adviser believes may
> be comparable to Senior Loan interests with
> respect to the following characteristics:
> credit quality, interest rate, interest rate
> redetermination period and maturity. . . .
> In determining the relationship between such
> instruments and the Senior Loan interests in the
> Fund's portfolio, the Adviser will consider on an
> ongoing basis, among other factors, (i) the
> credit worthiness of the Borrower and (ii) the
> current interest rate, the period until next
> interest rate redetermination and maturity of
> such Senior Loan interests.  It is expected that
> the Fund's net asset value will fluctuate as a
> function of interest rate and credit factors.

. . . The Adviser believes that Lenders selling Senior Loan interests or otherwise involved in a Senior Loan transaction may tend, in valuing Senior Loan interests for their own account, to be less sensitive to interest rate and credit quality changes and, accordingly, the Adviser does not intend to rely solely on such valuations in valuing the Senior Loan interests for the Fund's account. In addition, because a secondary trading market in Senior Loans has not yet fully developed, in valuing Senior Loans, the Adviser may not rely solely on but may consider, to the extent the Adviser believes such information to be reliable, prices or quotations provided by banks, dealers or pricing services with respect to secondary market transactions in Senior Loans. To the extent that an active secondary market in Senior Loan interests develops to a reliable degree, the Adviser may rely to an increasing extent on such market prices and quotations in valuing the Senior Loan interests in the Fund's portfolio. In light of the senior nature of Senior Loan interests included in the Fund's portfolio and taking into account the Fund's access to non-public information with respect to Borrowers relating to such Senior Loan interests, the Adviser does not currently believe that consideration on a systematic basis of ratings provided by any nationally recognized statistical rating organization or price fluctuations with respect to long- or short-term debt of such Borrowers subordinate to the Senior Loans of such Borrowers is necessary for the Determination of the value of such Senior Loan interests. Accordingly, the Adviser generally does not systematically consider (but may consider in certain instances) and, in any event, does not rely upon such ratings or price fluctuations in determining the value of Senior Loan interests in the Fund's portfolio.

Def. Exh. C at B-12.

The March 9, 1998 and December 9, 1998 prospectuses had contained identical statements. See Def. Exh. A at B-11-12; Def.

Exh. B at B-12.  The February 28, 2000 prospectus, however,

contained some change.  The February 2000 prospectus provided in

part:

> . . . Subject to criteria established by the
> Fund's Board of Trustees about the availability
> and reliability of market indicators obtained
> from independent pricing sources, certain Senior
> Loans will be valued at the mean of bid and ask
> market indicators supplied by independent sources
> approved by the Fund's Board of Trustees.  All
> other Senior Loans will be valued by considering
> a number of factors including consideration of
> market indicators, transactions in instruments
> which the Adviser believes may be comparable
> (including comparable credit quality, interest
> rate, interest rate redetermination period and
> maturity), the credit worthiness of the Borrower,
> the current interest rate, the period until next
> interest rate redetermination and maturity of
> such Senior Loan interests. . . .  To the extent
> that an active secondary trading market in Senior
> Loan interests develops to a reliable degree, the
> Fund may rely to an increasing extent on such
> market prices and quotations in valuing the
> Senior Loan interests in the Fund's portfolio.
>
> It is expected that the Fund's net asset
> value will fluctuate as a function of interest
> rate and credit factors. . . .  In light of the
> senior nature of Senior Loan interests that may
> be included in the Fund's portfolio and taking
> into account the Fund's access to non-public
> information with respect to Borrowers relating to
> such Senior Loan interests, the Fund does not
> currently believe that consideration on a
> systematic basis of ratings provided by any
> nationally recognized statistical rating
> organization or price fluctuations with respect
> to long- or short-term debt of such Borrowers
> subordinate to the Senior Loans of such Borrowers
> is necessary for a determination of the value of
> such Senior Loan interests.  Accordingly, the
> Fund generally will not systematically consider
> (but may consider in certain instances) and, in
> any event, will not rely upon such ratings or

> price fluctuations in determining the value of
> Senior Loan interests in the Fund's portfolio.

Def. Exh. D at B-11-12.

The annual and semiannual reports for the corresponding time periods contained similar statements, though in a more condensed form. Like the prospectuses, there was a similar change starting with the January 31, 2000 semiannual report. Plaintiffs are deemed to have at least constructive notice of the prospectuses and reports. See Whirlpool, 67 F.3d at 610; Eckstein v. Balcor Films Investors, 58 F.3d 1162, 1169 (7th Cir. 1995); Volk v. D.A. Davidson & Co., 816 F.2d 1406, 1416 (9th Cir. 1987).

The pre-September 2000 prospectuses or reports do not specifically identify which senior loans were priced with market quotations. Instead, they generally indicate market pricing was the less favored method of valuation being used by the Adviser on behalf of the Fund without specifying how often it was used. The January 31, 2000 semiannual report, however, has a question and answer section in which one answer states 42% of senior loans were then being valued based on market indicators. See Def. Exh. K at 8. Also, the prospectuses and reports represent that senior loans are generally illiquid. Additionally, each prospectus and report does contain a list of all senior loans held by the Fund on a particular date. Each list includes both

the principal balance of each loan and the Fund's valuation of each loan. Almost all of the loans are valued within 1% of par, with most valued within .1% of par.[6]

The prospectuses and reports also show that the NAV began to fall prior to September 2000. From September 1998 to July 1999, the NAV declined from $9.96 to $9.87, which was before a significant increase in the Fund's use of market pricing. As indicated in the January 31, 2000 semiannual report and the July 31, 2000 annual report, the NAV was down to, respectively, $9.61 and $9.50 by those dates. Plaintiffs point to an answer in the January 31, 2000 semiannual report stating that much of the past six months' decrease in NAV resulted from a rise in defaults in the health-care industry in which many of the Fund's loans were located. The February 28, 2000 prospectus also reports the January 31, 2000 NAV, as well as that the NAV was between $9.70 and $9.78 during the quarter ending December 31, 1999 and between $9.78 and $9.90 during the quarter ending September 30, 1999.

Additionally, it is alleged in ¶ 53(2d) of the Complaint that the Fund's NAV remained stable in 1998 despite "strong evidence" of "significant market gyrations" that should have been expected to have affected the market value of senior loans. As is alleged in paragraphs 41 and 42 of the Complaint, a December

---

[6]For example, of the first 100 long-term senior loans listed in the February 28, 2000 prospectus, only four are valued at less than 99% of par. See Def. Exh. D at F-2-7.

1999 SEC letter regarding the need to convert to market pricing generated coverage in the financial press, including articles in the Wall Street Journal and New York Times. The Wall Street Journal article specifically mentions the Fund, as do some of the articles in more specialized financial publication.

Although the prospectuses (as well as the reports) generally do not specifically identify the percentage of loans valued through market pricing, they do state that market pricing was not the favored method of valuation even as late as February and July 2000. Also, the prospectuses and reports both provide information showing that most loans were being valued near par. At the same time, the representation was also being made that market pricing was being used as it became readily available for particular loans. The question is whether a reasonable investor of ordinary intelligence and ordinary financial sophistication should have had his or her suspicions aroused enough to further investigate because he or she would have independently realized that market pricing may be more readily available than was represented in the prospectuses and/or that valuing most of the loans near par was inconsistent with economic reality.

Although defendants point to some media coverage addressing likely problems with the valuing of loans being done by senior loan funds, on the motion to dismiss, it cannot be found that this potential problem received such pervasive

coverage that the average investor should have been aware of it and then been prompted to specifically investigate the valuations being done by the Fund. See <u>Washington National Insurance Co. of New York v. Morgan Stanley & Co.</u>, 1999 WL 461796 *9-10 (S.D.N.Y. July 2, 1999); <u>Great Neck Capital Appreciation Investment Partnership, L.P. v. PricewaterhouseCoopers, L.L.P.</u>, 137 F. Supp. 2d 1114, 1125-26 (E.D. Wis. 2001); <u>DeLeonardis v. Berg</u>, 1998 WL 760338 *2 (E.D.N.Y. Sept. 15, 1998), <u>aff'd by unpublished order</u>, 199 F.3d 1321 (2d Cir. 1999); <u>Tracinda Corp. v. Daimlerchrysler AG</u>, ___ F. Supp. 2d ___, 2002 WL 459224 *10 (D. Del. March 22, 2002). It would be a factual question as to whether the media coverage was sufficient to place plaintiffs on inquiry notice.

Moreover, throughout the pertinent time period the prospectuses and reports continued to represent that market pricing was being used whenever it became available. The plaintiffs would not have had adequate reason to disbelieve or question these statements so as to raise an objective basis for further inquiry. Defendants point to the listing of assets showing that most of the loans were being valued near par and plaintiffs' allegation that it would be clear that valuing illiquid assets near par would be an inaccurate valuation. However, given the representation that as many as 42% of the loans were being priced through market quotations, it was not

necessarily obvious that valuations at par did not represent a correct valuation.

Defendants also point to the stable NAV, even during alleged market gyrations, followed by substantial drops in NAV. Again, on the motion to dismiss, it cannot be conclusively determined that the stable NAVs were sufficient to raise enough suspicion to place plaintiffs on inquiry notice. As to the drops in NAV, the Fund provided the explanation that it was due to a large number of loans from health care companies and the financial condition of that industry. Also, it is alleged that the NAV drop was made more gradual by gradually implementing market pricing. Had all available market pricing been implemented in one reporting period, the larger one-time drop would have raised greater suspicion than the gradual implementation that was employed. It cannot be held that it was unreasonable to fail to inquiry further when provided with the reported explanation for the drop in NAV.

On defendants' motion to dismiss, plaintiffs' federal claims will not be dismissed based on the statute of limitations. It cannot be held that the facts properly before the court conclusively contradict plaintiffs' allegation that they could not have reasonably discovered their claims more than a year before the filing of the original complaint. This ruling is

without prejudice to raising these factual issues on summary judgment or at trial.

Defendants contend the securities claims fail on their merits because the prospectuses contained no misrepresentative disclosures or omissions. They contend the prospectuses accurately described the Fund's valuation policy, disclosed that the Fund's NAV could vary because of the credit quality of the borrowers, and disclosed that the Fund's stated objective of preserving capital could not be assured. As alleged in the Complaint, however, the representations as to valuation policy were false because the Fund did not actually follow the stated policy. It is true that, at least prior to January 2000, the Fund indicated market pricing was less favored, but it still represented that it would use market pricing where it developed to a "reliable degree." As of January 2000, a change was made indicating a greater use of market pricing and it continued to be represented that such pricing would be used where it developed to a "reliable degree." However, as alleged by plaintiffs, the Fund did not use market pricing for all loans for which market pricing was readily available. Therefore, it was an inaccurate representation that market pricing was being used as it developed to a reliable degree. It is also alleged that the Fund omitted disclosing that it was not complying with SEC regulations requiring the use of market pricing where readily available.

Additionally, it is alleged that, in determining "fair value," the Fund also misvalued the loans. Plaintiffs have alleged false representations or omissions as to valuing the loans.

As to the alleged misvaluing of loans using the fair value method, defendants contend this is an allegation of corporate mismanagement that does not state a violation of § 11 or § 12, citing <u>Santa Fe Industries, Inc. v. Green</u>, 430 U.S. 462 (1977). <u>See also</u> <u>Shaw v. Digital Equipment Corp.</u>, 82 F.3d 1194, 1206 (1st Cir. 1996); <u>7547 Corp. v. Parker & Parsley Development Partners, L.P.</u>, 38 F.3d 211, 231 (5th Cir. 1994); <u>Craftmatic Securities Litigation v. Kraftsow</u>, 890 F.2d 628, 638 n.14 (3d Cir. 1989). To the extent plaintiffs allege that it was a misrepresentation to use a "fair value" instead of available market pricing while representing market pricing was being used where available, that is not nonactionable corporate mismanagement; it is a misrepresentation as to the practices actually being applied. Similarly, defendants ignoring market pricing as a factor in determining fair value would be inconsistent with the representation that this factor was part of the fair value method. However, in those situations where market pricing was not available and plaintiffs allege defendants simply misvalued the loan using the "fair value" method, plaintiffs may be alleging nonactionable corporate mismanagement. In response to the motion to dismiss, plaintiffs contend they do not make

this last type of claim.  On the present pleadings, it cannot be determined that any of plaintiffs' allegations constitute mere corporate mismanagement.

Defendants' last contention is that plaintiffs' claims fail to satisfy the specificity requirement of Rule 9(b).  As is discussed above, Rule 9(b) does not apply to plaintiffs' claims.

Still to be considered is the Count IV supplemental state law claim.  In Count IV, it is alleged that all defendants, except the Fund itself, breached their fiduciary duties to the Fund and its shareholders by inflating the NAV.  The inflated NAV resulted in both a higher purchase price for Fund shares and a higher fee for defendants whose fee was determined by a percentage of the Fund's value.  Defendants contend this claim should be dismissed because it may only be brought as a derivative claim in the name of the Fund.  The parties agree that, because the Fund is a Massachusetts business trust, Massachusetts law applies in determining whether this claim may be brought as a direct claim.

Under Massachusetts law, "The derivative action seeks, after management has failed or refused to act, to redress a wrong to a corporation or association (usually by a few of its shareholders or members) . . .  [T]he wrong underlying a derivative action is indirect, at least as to the shareholders. It adversely affects them merely as they are the owners of the

corporate stock; only the corporation itself suffers the direct wrong. . . . [A] complaint alleging mismanagement or wrongdoing on the part of corporate officers or directors normally states a claim of wrong to the corporation: the action, therefore, is properly derivative." Jackson v. Stuhlfire, 28 Mass. App. Ct. 924, 547 N.E.2d 1146, 1148 (1990) (quoting Smith & Zobel, Mass. Rules Practice § 23.1.1 (1975)) (ellipses in Stuhlfire).

The overcharging of management fees affects the corporation as a whole; it does not directly affect individual shareholders. Such a claim may only be brought as a derivative claim. Green v. Nuveen Advisory Corp., 186 F.R.D. 486, 489-90 (N.D. Ill. 1999) (Massachusetts and Minnesota law). See also Strougo v. Bassini, 282 F.3d 162, 174 (2d Cir. 2002) (Maryland law); Marquit v. Dobson, 2000 WL 4155 *1-2 (S.D.N.Y. Jan. 3, 2000), aff'd by unpublished order sub nom., Marquit v. Williams, 229 F.3d 1135 (2d Cir. 2000) (same); Olesh v. Dreyfus Corp., 1995 WL 500491 *7-8 (E.D.N.Y. Aug. 8, 1995) (same); In re Nuveen Fund Litigation, 855 F. Supp. 950, 954-55 (N.D. Ill. 1994) (Minnesota law). Count IV will be dismissed without prejudice[7] to the extent it contains a claim based on defendants receiving additional management fees based on an inflated NAV.

---

[7]The dismissal is without prejudice to a properly maintained derivative action. Also, the dismissal is without prejudice to any claim that may be brought by any putative class member since the putative class members have not, at this point, been joined in this action.

Count IV also contains a claim that plaintiffs overpaid for newly purchased shares because of the inflated NAVs. Such a claim is not one on behalf of the corporation because the corporation does not purchase shares from itself. Moreover, such a claim affects different shareholders differently and places shareholders in potential conflict with each other since an inflated NAV affects existing shareholders differently than new purchasers. See Strougo, 282 F.3d at 174-75. The Count IV claim of breach of fiduciary duty based on inflated NAVs affecting new purchases may be brought directly. Id. See also Mann v. Kemper Financial Cos., 247 Ill. App. 3d 966, 618 N.E.2d 317, 327 (1st Dist. 1992) (Illinois law). This aspect of Count IV will not be dismissed.

The court previously ruled, as jointly requested by the parties, that, under the PSLRA, it is appropriate to resolve the merits of a complaint prior to ruling on class certification. A briefing schedule will be set for the pending motion for class certification and a discovery schedule will be established.

IT IS THEREFORE ORDERED that plaintiffs' motion for reconsideration is granted. The Memorandum Opinion and Order dated May 16, 2002 is vacated. Defendants' motion to dismiss [20-1] is granted in part and denied in part. Count IV is dismissed in part without prejudice to the extent it contains a claim based on the overcharging of management fees because of

inflated values.  Defendants shall answer the complaint on or before June 12, 2002.

ENTER:

UNITED STATES DISTRICT JUDGE

DATED:  MAY 29 , 2002