# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | WILLIAM T. HART | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | **01 C 7538** | **DATE** | **JUNE 24, 2004** |
| **CASE TITLE** | **IRENE ABRAMS, etc. v. VAN KAMPEN FUNDS, INC., et al.** | | |

**MOTION:**  [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐  Filed motion of [ use listing in "Motion" box above.]

(2) ☐  Brief in support of motion due _____.

(3) ☐  Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐  Ruling/Hearing on _____ set for _____ at _____.

(5) ☐  Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐  Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐  Trial[set for/re-set for] on _____ at _____.

(8) ☐  [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐  This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■  [Other docket entry]   **Plaintiffs' motions to strike [105-1, 107-1] are denied without prejudice. Plaintiffs' motion for summary judgment [102-1] is denied. Defendants' motion for summary judgment [98-1] is granted in part and denied in part. Plaintiffs' claims are dismissed to the extent they are based on defendants' alleged misrepresentations of the Fund's investment goals. A status hearing to report on the possibility of settlement will be held on July 21, 2004 at 11:00 a.m.**

(11) ■  **[For further detail see attached Memorandum Opinion and Order.]**

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | | 6 number of notices | |
| ✔ | Notices mailed by judge's staff. | | JUN 2 5 2004 date docketed | |
| | Notified counsel by telephone. | | | 129 |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | 6/24/2004 date mailed notice | |
| | Copy to judge/magistrate judge. | | | |
| | courtroom deputy's initials *CW* | | mqm mailing initials | |

Date/time received in Central Clerk's Office

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

IRENE ABRAMS, on behalf of     )
herself and all others         )
similarly situated,            )
                               )
              Plaintiffs,      )
                               )
        v.                     )     No. 01 C 7538
                               )
VAN KAMPEN FUNDS, INC.,        )
VAN KAMPEN INVESTMENT ADVISORY )
CORPORATION, VAN KAMPEN PRIME  )
RATE INCOME TRUST, HOWARD TIFFEN, )
RICHARD F. POWERS, III, STEPHEN L. )
BOYD, DENNIS J. McDONNELL,     )
and JEFFREY W. MAILLET,        )
                               )
              Defendants.      )

## MEMORANDUM OPINION AND ORDER

This is a consolidated class action alleging federal
securities violations involving defendant Van Kampen Prime Rate
Income Trust's (the "Fund") valuation of senior loans and is
subject to the Private Securities Litigation Reform Act of 1995
("PSLRA"), 15 U.S.C. § 77z-1.  A class has been certified
consisting of all persons who purchased shares in the Fund
between September 30, 1998 and March 26, 2001, inclusive, with
defendants and certain related parties excluded.  See Abrams v.
Van Kampen Funds, Inc., 2002 WL 1989401 (N.D. Ill. Aug. 27,

2002). Named as defendants are the Fund; Van Kampen Funds, Inc. ("Van Kampen"), the Fund's administrator; Van Kampen Investment Advisory Corp. (the "Adviser"), the Fund's investment adviser; Richard Powers, Fund Chairman of the Board, President, and Trustee during the relevant time period; Dennis McDonnell, former Fund Chairman of the Board, President, and Trustee and Fund Portfolio Manager from July 1999 until December 1999; Stephen Boyd, Fund Executive Vice President and Chief Investment Officer and Adviser Officer during the relevant time period; Howard Tiffen, Fund Portfolio Manager since December 1999 and Adviser Officer; and Jeffrey Maillet, Fund Portfolio Manager and Adviser Officer until July 1999. Count I of the Consolidated Amended Complaint alleges violations of § 11 of the Securities Act, 15 U.S.C. § 77k, against Van Kampen, the Fund, Powers, McDonnell, and Boyd. Against Van Kampen and the Adviser, Count III alleges control person liability under § 15 of the Securities Act, 15 U.S.C. § 77o, based on the alleged § 11 violations.[1] Pending

---

[1]Defendants argue the Count IV state law breach of fiduciary duty claims are preempted. Plaintiffs do not concede these claims are preempted, but do not oppose Count IV's dismissal for the stated reason that adequate relief can be obtained on the § 11 claims. Defendants represent that plaintiffs have indicated they intend to voluntarily dismiss with prejudice the Count II claims based on alleged violations of § 12 of the Securities Act, 15 U.S.C. § 77l. Plaintiffs do not so state in any of their briefs, but give no indication to the contrary. The parties may be required to address the question of whether the procedures contained in Fed. R. Civ. P. 23(e) would apply to the dismissal of Counts II and IV (including the dismissal of defendants Tiffen and Maillet) and, if so, the

are the parties' cross motions for summary judgment. Plaintiffs have also filed two motions to strike or exclude the testimony of three of defendants' experts.

Plaintiffs presently contend that defendants violated § 11 by making the following misrepresentations in various prospectuses that were issued during the class period. First, plaintiffs contend that defendants misrepresented the value of shares of the Fund in that they overvalued the loans held by the Fund. Plaintiffs contend that using available market quotations and properly determining fair value based on what the loans would have currently sold for would have resulted in lower daily net asset values ("NAV") for the Fund. Second, plaintiffs contend the prospectuses contained misrepresentations that the Fund used market quotations where available when this was not done. Third, plaintiffs contend that the prospectuses contained misrepresentations that the Fund's investment goal was preservation of capital even though the Fund was not managed with such a goal.

To succeed on their § 11 claims, plaintiffs must show that defendants were responsible for untrue statements of material fact or omitted material facts in a prospectus. See Herman & MacLean v. Huddleston, 459 U.S. 375, 381-82 (1983);

---

appropriate procedures to follow. At the present time, no ruling is made as to the dismissal of these claims.

<u>Abrams v. Van Kampen Funds, Inc.</u>, 2002 WL 1160171 *5 (N.D. Ill. May 30, 2002) ("<u>Abrams I</u>"); <u>Asher v. Baxter International, Inc.</u>, 2003 WL 21825498 *5 (N.D. Ill. July 24, 2003).  There is no scienter or reliance requirement; instead responsible persons are liable for the material and misleading statements contained in a prospectus unless they can affirmatively make certain showings as to their knowledge and diligence.  <u>See</u> <u>Herman</u>, 459 U.S. at 382; <u>Abrams I</u>, 2002 WL 1160171 at *5; <u>Asher</u>, 2003 WL 21825498 at *5.  A misstatement is material if there is a substantial likelihood that it would be viewed by a reasonable investor as significantly altering the total mix of available information and thus important to the investor's decision to invest.  <u>TSC Industries, Inc. v. Northway, Inc.</u>. 426 U.S. 438, 449 (1976); <u>Abrams I</u>, 2002 WL 1160171 at *5.

Here, a central issue for plaintiffs' claims is the method of valuing the senior loans held by the Fund.  The parties do not dispute that the applicable general principle is that the loans were to be valued on a daily basis at the amount that could have been obtained from a current sale.  <u>See</u> SEC Accounting Release Series No. 118, 1970 WL 5621 *4 (Dec. 30, 1970) ("ASR 118"); <u>In re Allied Capital Corp. Securities Litigation</u>, 2003 WL 1964184 *1 (S.D.N.Y. April 25, 2003); <u>In re Eaton Vance Corp. Securities Litigation</u>, 206 F. Supp. 2d 142, 151-52 (D. Mass. 2002).  <u>See also</u> 15 U.S.C. § 80a-2(a)(41)(B); 17 C.F.R.

§ 270.2a-4(a).  The parties also agree that current value is to be determined by "market quotations" where "readily available," or by "fair value" methods if market quotations are not readily available.  See 15 U.S.C. § 80a-2(a)(41)(B); 17 C.F.R. § 270.2a-4(a)(1); ASR 118, 1970 WL 5621 at *3; Eaton Vance, 206 F. Supp. 2d at 147.  Regarding the class period, the parties disagree as to whether the pricing services that were then available qualified as readily available market quotations.  To the extent it was appropriate to use fair value methods, the parties also disagree as to whether defendants adequately determined current value.

Regarding securities traded over the counter, ASR 118 provides:

> Over-the-counter securities.  Quotations are available from various sources for most unlisted securities traded regularly in the over-the-counter market.  These sources include tabulations in the financial press, publications of the National Quotation Bureau and the 'Blue List' of municipal bond offerings, several financial reporting services, and individual broker-dealers.  These quotations generally are in the form of inter-dealer bid and asked prices.  Because of the availability of multiple sources, a company frequently has a greater number of options open to it in valuing securities traded in the over-the-counter market than it does in valuing listed securities.  A company may adopt a policy of using a mean of the bid prices, or of the bid and asked prices, or of the prices of a representative selection of broker-dealers quoting on a particular security; or it may use a valuation within the range of bid and asked prices considered best to represent value in the circumstances.  Any of these policies is

acceptable if consistently applied.  Normally,
the use of asked prices alone is not acceptable.
        Ordinarily, quotations for a security should
be obtained from more than one broker-dealer,
particularly if quotations are available only
from broker-dealers not known to be established
market-markers for that security, and quotations
for several days should be reviewed.  If the
validity of the quotations appears to be
questionable, or if the number of quotations is
such as to indicate that there is a thin market
in the security, further consideration should be
given to whether 'market quotations are readily
available.'  If it is decided that they are not
readily available, the security should be
considered one required to be valued at 'fair
value as determined in good faith by the board of
directors.'

ASR 118, 1970 WL 5621 at *4.

        To qualify as readily available market quotations

that must be used to value securities, the pricing services must

provide quotes that are sufficiently timely, sufficiently

frequent, and sufficiently accurate.  <u>Eaton Vance</u>, 206

F. Supp. 2d at 148-49.

        On a motion for summary judgment, the entire record is

considered with all reasonable inferences drawn in favor of the

nonmovant and all factual disputes resolved in favor of the

nonmovant.  <u>Turner v. J.V.D.B. & Associates, Inc.</u>, 330 F.3d 991,

994-95 (7th Cir. 2003); <u>Palmer v. Marion County</u>, 327 F.3d 588,

592 (7th Cir. 2003); <u>Abrams v. Walker</u>, 307 F.3d 650, 653-54 (7th

Cir. 2002).  The burden of establishing a lack of any genuine

issue of material fact rests on the movant.  <u>Outlaw v. Newkirk</u>,

259 F.3d 833, 837 (7th Cir. 2001); <u>Wollin v. Gondert</u>, 192 F.3d

616, 621-22 (7th Cir. 1999). The nonmovant, however, must make a showing sufficient to establish any essential element for which he, she, or it will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Binz v. Brandt Construction Co., 301 F.3d 529, 532 (7th Cir. 2002); Traylor v. Brown, 295 F.3d 783, 790 (7th Cir. 2002). The movant need not provide affidavits or deposition testimony showing the nonexistence of such essential elements. Celotex, 477 U.S. at 324. Also, it is not sufficient to show evidence of purportedly disputed facts if those facts are not plausible in light of the entire record. See NLFC, Inc. v. Devcom Mid-America, Inc., 45 F.3d 231, 236 (7th Cir.), cert. denied, 515 U.S. 1104 (1995); Covalt v. Carey Canada, Inc., 950 F.2d 481, 485 (7th Cir. 1991); Collins v. Associated Pathologists, Ltd., 844 F.2d 473, 476-77 (7th Cir.), cert. denied, 488 U.S. 852 (1988). As the Seventh Circuit has summarized:

> The party moving for summary judgment carries the initial burden of production to identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Logan v. Commercial Union Ins. Co., 96 F.3d 971, 978 (7th Cir. 1996) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (citation and internal quotation omitted)). The moving party may discharge this burden by "'showing'--that is, pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325, 106 S. Ct. 2548. Once the moving party satisfies this burden, the nonmovant must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "The nonmovant must do

more, however, than demonstrate some factual disagreement between the parties; the issue must be 'material.'" Logan, 96 F.3d at 978. "Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute." Id. (citation omitted). In determining whether the nonmovant has identified a "material" issue of fact for trial, we are guided by the applicable substantive law; "[o]nly disputes that could affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." McGinn v. Burlington Northern R.R. Co., 102 F.3d 295, 298 (7th Cir. 1996) (citation omitted). Furthermore, a factual dispute is "genuine" for summary judgment purposes only when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Hence, a "metaphysical doubt" regarding the existence of a genuine fact issue is not enough to stave off summary judgment, and "the nonmovant fails to demonstrate a genuine issue for trial 'where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party . . . .'" Logan, 96 F.3d at 978 (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)).

Outlaw, 259 F.3d at 837.

Plaintiffs have moved to strike the testimony of defendants' liability expert Michael McAdams and to exclude the testimony of defendants' damages experts Daniel Fischel and David Ross. Since defendants do not presently rely on McAdams's expert report or testimony, the motion to strike his testimony need not be considered. That motion will be denied without prejudice to filing any motion in limine with the final pretrial order.

Regarding the damages experts, plaintiffs characterize one of their arguments as going to the reliability of the damages

experts' testimony. However, plaintiffs do not argue that the two experts do not have adequate qualifications or that they relied on unacceptable methodologies. Instead, plaintiffs argue that the experts' testimony about general economic and market principles are not adequately connected to or supported by the facts of this case. There is no need to separately consider whether the experts' testimony should be excluded. To the extent the experts' opinions do not support any material fact, their testimony will not defeat summary judgment. Also, any question of whether the opinion of a second expert is unnecessarily cumulative would be an evidentiary issue for a trial before a jury, not an issue to be considered when a judge is ruling on a summary judgment motion. The motion to exclude will be denied without prejudice to filing any motion in limine with the final pretrial order.

The facts taken as true for purposes of summary judgment are as follows. Where there are genuine factual disputes, the differing facts that will be taken as true for each side's motion will be noted. The Fund was organized in 1989 as a senior loan fund. Senior loans are loans made by banks and other financial institutions to corporations, partnerships, and other businesses and which have priority over most other debts of the borrower. Because of the priority, they achieve a high rate of recovery. Also, because they have a floating or variable interest rate, their value is only minimally affected by changes in market interest rates. There is no organized market for senior loans;

they are generally purchased through privately negotiated
transactions. Most of the Fund's assets are purchased in the
primary market, that is by acquiring a piece of the original loan
from the issuing financial institution and becoming a member of
the lending syndicate. Some of the Fund's assets are acquired in
the secondary market, that is by purchasing a piece of a loan
after the lending syndicate was completed. During the class
period, approximately $1 trillion of senior loans originated
annually in the senior market. During the same time period, the
value of senior loans sold in the secondary market was
approximately $100 billion annually.

Plaintiffs present evidence that they contend
conclusively establishes that market quotations were readily
available. Beginning in the early 1990's and continuing until at
least the end of 1999, Van Kampen provided lists of the Fund's
senior loan assets to both Donaldson Lufkin Jenrette ("DLJ") and
Societe Generale ("SocGen"). For a fee, DLJ and SocGen provided
daily lists of "pricing indications" for the loans that were
held. In the early 1990's, they provided indications for
approximately 10 to 15 percent of the loans. By the end of 1999,
they provided indications for approximately 75 percent of the
loans. The indications were reported as bids and offers, but did
not necessarily represent bids or offers made by parties actually
willing to complete a transaction. One Van Kampen employee
characterizes the bids and offers as "an indication that this is
somewhere near the price range where [DLJ and SocGen] think maybe

something will take place. It's an opinion." Pierce Dep. 148.
DLJ and SocGen did sometimes complete transactions for the prices
indicated. Van Kampen received similar indications from a number
of banks and broker-dealers, including Citibank, Merrill Lynch,
Salomon Smith Barney, Goldman Sachs, and Morgan Stanley Dean
Witter.

Plaintiffs provide 2000 correspondence from the SEC
concerning the SEC's findings following a November 1999 on-site
inspection of Van Kampen senior loan operations, including the
Fund. See Pl. Exh. 28, 56, 58. The findings of the SEC may be
admissible evidence. See Fed. R. Evid. 803(8)(C); United
States v. Peitz, 2002 WL 31101681 *5 (N.D. Ill. Sept. 20, 2002).
The SEC findings support that readily available market quotations
existed for at least some loans held by the Fund and the Fund
nevertheless used other valuation methods.

In 1985, the Loan Pricing Corporation ("LPC") began
gathering data on senior loans. On a weekly basis, LPC issued
Gold Sheets that contained pricing information for selected
loans. In Fall 1999, Van Kampen contracted with LPC to provide
secondary market pricing. By late 1999, most of LPC's pricing
information was available on a daily basis. During at least a
portion of the class period, Van Kampen received the Gold Sheet
from LPC. As of that time, the Gold Sheet included a regular
column listing bids for "distressed loans." The pricing
information provided by LPC was based on information obtained
from various participants in the senior loan market. Some or

much of the information consisted of indications from brokers or dealers that did not necessarily reflect prices they would actually pay for the loans. Plaintiffs, however, provide evidence that would support that, during the class period, LPC's pricing information was reliable. Defendants' evidence as to LPC's sources, however, could support that the pricing information was not reliable. On the evidence before the court, a genuine factual dispute exists as to the reliability of LPC's pricing information during the class period.

In 1995, the Loan Syndication and Trading Association ("LSTA") was formed by prominent senior loan traders. It sought to develop a third-party, non-biased pricing service. Initially its service was available to only "sell side" loan traders and dealers. By mid or late 1998, however, the service was also made available to those on the "buy side." Originally, a monthly Mark to Market List was provided. By October 1998, the Mark to Market List was provided weekly. In 1997, LSTA began a relationship with LPC. In September 1999, a joint LSTA/LPC service was made available to both buyers and sellers. This service lists the number of available indications (bids or offers) and their average. It does not identify the source of the indications, the price of individual bids or offers, nor the high and low. Again, the bids and offers used for this pricing service do not necessarily indicate a price that the bidding or offering entity is committed to paying or receiving. As of October 1999, pricing for approximately half of the Fund's loans were provided on a

daily basis and, for the other half, on a weekly basis. By November 1999, daily pricing was provided for 97% of the Fund's loans.

Defendants were also able to obtain some pricing information simply by requesting a price from a particular broker or dealer.

By no later than November 1999, as to most of the Fund's loans, the LSTA/LPC service apparently satisfied the frequency and timeliness requirements for a readily available market quotation. During the class period prior to November 1999, DLJ and SocGen provided frequent and timely quotations for a substantial percentage of the Fund's loans. However, on the evidence before the court, a genuine factual dispute exists as to whether, during the class period, the indications provided by the various services were sufficiently reliable to satisfy the reliability component of being a readily available market quotation. Thus, for the entire class period, a genuine factual dispute exists as to whether readily available market quotations existed.

In September 1999, the Fund began subscribing to the LSTA/LPC service. In January 2000, the Fund adopted a policy known as a "3 x 3 x 100 screen." Subject to an override by the Fund's pricing committee, the LSTA/LPC service would be used to value loans as long as there were at least three bids, at least three asks, and the difference between each average was no more than 100 basis points. The value used would be the mean of the

ask average and bid average. As of January 2000, this valuation method applied to 40% of the Fund's loans. In November 2000, the Fund began applying a "2 x 2 x 200 screen." By January 2001, this valuation method applied to 80% of the Fund's loans.

Since a genuine factual dispute exists as to whether there were readily available market quotations, plaintiffs cannot be entitled to summary judgment on any claim that requires that there be readily available market quotations. Therefore, they cannot be entitled to summary judgment on their claim that defendants misrepresented that they used readily available market quotations when available. They also cannot be entitled to summary judgment on their claim of overvaluation of loans to the extent that the claim is based on accepting the indications as necessarily representative of value because the indications constituted readily available market quotations.[2] On the other side, defendants cannot be entitled to summary judgment on these claims based on defendants' contention that readily available market quotations did not exist. Defendants other contentions still must be considered, as well as plaintiffs' claims that are not necessarily dependent on there being readily available market quotations.

---

[2]Plaintiffs also contend that, even if the indications did not constitute readily available market quotations, defendants misrepresented that they were applying the fair value method because, according to plaintiffs, defendants were not valuing the loans based on what the loans could be sold at currently and were not relying on market indications as they represented in the prospectuses.

Defendants contend that, even assuming the indications qualified as readily available market quotations, it was within their business judgment to conclude otherwise. The burden, however, is on defendants to show that they acted with due diligence in believing any misstatements in the prospectuses were actually true. See 15 U.S.C. § 77k(b)(3); In re Global Crossing, Ltd. Securities Litigation, 313 F. Supp. 2d 189, 211 (S.D.N.Y. 2003); In re Enron Corp. Securities, Derivative & ERISA Litigation, 258 F. Supp. 2d 576, 639 (S.D. Tex. 2003). Defendants do not present evidence conclusively establishing this affirmative defense. Therefore, they cannot be entitled to summary judgment based on exercising their business judgment.

For the foregoing reasons, the claim that defendants misrepresented that they would rely on market quotations where readily available (including the closely related claim of the resulting overvaluation from not using market quotations) cannot be resolved on either party's summary judgment motion. A genuine factual dispute exists as to these claims.

Still to be considered is whether a genuine factual dispute exists regarding whether defendants misrepresented their use of the fair value method. The misrepresentation issue is not whether defendants simply miscalculated or failed to accurately estimate the value of loans, see Abrams I, 2002 WL 1160171 at *11, but whether defendants made inaccurate statements as to the valuation method that they were using. The parties agree that statutes and regulations required that the senior loans be

valued at the then-current price for which they could be expected
to be sold and that defendants thus represented that the daily
NAV's were determined on that basis.  Plaintiffs contend that,
instead, loans were often valued at par based on an expectation
that, at maturity, the loans would be paid off in full.
Plaintiffs also contend that defendants represented that, in
determining fair value, they would take into consideration market
indicators, but that, in determining fair value, defendants often
ignored market indicators supporting a lower value than that used
by defendants.

The March 9, 1998, December 9, 1998, and June 21, 1999
Fund prospectuses included the following representation regarding
the determination of NAV.

> The value of the Fund's portfolio will be
> determined by the Adviser, following guidelines
> established and periodically reviewed by the
> Trustees.   Interests in Senior Loans will be
> valued by the Adviser on behalf of the Fund on
> the basis of market quotations and transactions
> in instruments which the Adviser believes may be
> comparable to Senior Loan interests with respect
> to the following characteristics:   credit
> quality, interest rate, interest rate
> redetermination period and maturity. . . .   In
> determining the relationship between such
> instruments and the Senior Loan interests in the
> Fund's portfolio, the Adviser will consider on an
> ongoing basis, among other factors, (i) the
> credit worthiness of the Borrower and (ii) the
> current interest rate, the period until next
> interest rate redetermination and maturity of
> such Senior Loan interests.   It is expected that
> the Fund's net asset value will fluctuate as a
> function of interest rate and credit factors.
> . . . [B]ecause a secondary trading market in
> Senior Loans has not yet fully developed, in
> valuing Senior Loans, the Adviser may not rely
> solely on but may consider, to the extent the
> Adviser believes such information to be reliable,

prices or quotations provided by banks, dealers or pricing services with respect to secondary market transactions in Senior Loans. To the extent that an active secondary market in Senior Loan interests develops to a reliable degree, the Adviser may rely to an increasing extent on such market prices and quotations in valuing the Senior Loan interests in the Fund's portfolio.

While it is represented that market quotations and indications will be considered in determining value, such statements are qualified based on such indications being reliable. As previously discussed, a genuine factual dispute exists as to the reliability of the then-available indications. Additionally, including during the time period of these prospectuses, genuine factual disputes exist as to the extent to which defendants relied on indications in valuing loans. Each side points to evidence supporting its contentions, but none of the evidence is conclusive. There is also evidence on both sides of the issue as to defendants valuing loans based on the expected recovery upon maturity or a workout for a troubled company. Genuine factual disputes preclude resolving these claims on summary judgment.

Regarding how NAV was determined, the February 28, 2000 Fund prospectus, stated in part: "Subject to criteria established by the Fund's Board of Trustees about the availability and reliability of market indicators obtained from independent pricing sources, certain Senior Loans will be valued at the mean of bid and ask market indicators supplied by independent sources approved by the Fund's Board of Trustees."

The description for how other loans were to be valued was similar to the description contained in the previously quoted prospectuses. It was also added that "The fair value of Senior Loans are reviewed and approved by the Fund's Valuation Committee and by the Fund's Trustees." Regarding the secondary market, it was stated: "To the extent that an active secondary trading market in Senior Loan interests develops to a reliable degree, the Fund may rely to an increasing extent on market prices and quotations in valuing Senior Loan interests in the Fund's portfolio. The Fund and Trustees will continue to monitor developments in the Senior Loan market and will make modifications to the current valuation methodology as deemed appropriate."

While the description contained in the February 2000 prospectus may accurately incorporate the Fund's adoption of the 3 x 3 x 100 screen, there is still a genuine factual dispute as to the Fund actually taking into consideration available indicators for valuing loans that did not fall within the 3 x 3 x 100 screen.

The November 20, 2000 prospectus stated that: "Under the valuation guidelines, Senior Loans and securities for which reliable market quotes are readily available are valued at the mean of such bid and ask quotes and all other Senior Loans, securities and assets of the Fund are valued at fair value in good faith following procedures established by the Board of Trustees." Other loans are described as being valued depending

on the availability and reliability of market indicators or based

on independent pricing sources and market indicators. It is

again stated that the secondary trading market will increasingly

be relied upon to the extent it develops to a reliable degree.

While the Fund continued to increasingly make valuation

determinations based on market indications, genuine factual

disputes exist as to whether the valuations not based on the

means of bids and asks relied on market indicators as described

in the November 2000 prospectus.

Neither side is entitled to summary judgment on claims

based on defendants misrepresenting the valuation methods being

used.

The last claim to consider is whether defendants

misrepresented the investment objective of the Fund. Plaintiffs

contend that defendants misrepresented that preservation of

capital was an investment goal. Plaintiffs contend it is evident

that this was not an actual goal because defendants had to

artificially inflate the NAV to maintain a purportedly stable

NAV. Even ignoring that having a goal does not necessarily mean

that it will be achieved, plaintiffs' argument is based on a

deficient premise. Plaintiffs' contention that defendants

artificially inflated NAV is not limited to NAV being inflated as

the actual NAV dropped during a later time period. Under

plaintiffs' theory, because defendants failed to adequately

consider available market quotations and indicators and tended to

value at par, the NAV was already inflated at the beginning of

the class period as well as previously. Plaintiffs point to no evidence that the true (in plaintiffs' view) NAV declined during the class period. Thus, the foundation for plaintiffs' argument is lacking. Moreover, plaintiffs point to no evidence that, contrary to a goal of preserving capital, defendants invested in riskier loans than had been represented. Any claims based on misrepresenting a goal of preservation of capital will be dismissed.

Since plaintiffs are not being granted summary judgment as to liability, there is no need to address questions of damages. It is noted, however, that the arguments as to damages failed to adequately articulate the parties' contentions as to damages. Any pretrial order that is filed should contain a clear articulation and calculation of the parties' positions as to damages.

Within 10 days after the date of this opinion, the parties shall meet to discuss the possibility of settlement. At the next status hearing the parties shall report on the possibility of settlement. If it does not appear likely that settlement will occur, a date will be set for presentation of the final pretrial order.[3]

---

[3]If the case does not appear likely to settle, the parties will also be required to separately address the question of whether plaintiffs' voluntarily dismissal of the § 12 and fiduciary duty claims requires notice, hearing, and/or court approval. Otherwise, dismissal of those claims would not need to be separately considered and would only be considered in the context of the overall settlement.

IT IS THEREFORE ORDERED that plaintiffs' motions to strike [105-1, 107-1] are denied without prejudice. Plaintiffs' motion for summary judgment [102-1] is denied. Defendants' motion for summary judgment [98-1] is granted in part and denied in part. Plaintiffs' claims are dismissed to the extent they are based on defendants' alleged misrepresentations of the Fund's investment goals. A status hearing to report on the possibility of settlement will be held on July 21, 2004 at 11:00 a.m.

ENTER:

William T. Hart

UNITED STATES DISTRICT JUDGE

DATED: JUNE 24, 2004