# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | WILLIAM T. HART | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 01 C 7538 | DATE | JANUARY 12, 2005 |
| CASE TITLE | IRENE ABRAMS, etc. v. VAN KAMPEN FUNDS, INC., et al. | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   Motion [138-1] is denied without prejudice. Motions [139-1], [140-1], [141-1], [144-1], and [145-1] are granted in part and denied in part. Motion [142-1] is granted. Motions [137-1] and [143-1] are denied. This case will be referred to the assigned magistrate judge to supervise settlement discussions. A status hearing before Judge Hart will be held on March 16, 2005 at 11:30 a.m.

(11) ■   [For further detail see attached Memorandum Opinion and Order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 6 | Document Number |
| | No notices required. | | number of notices | |
| ✔ | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | JAN 13 2005 | |
| | Docketing to mail notices. | | date docketed | 163 |
| | Mail AO 450 form. | | | |
| ✔ | Copy to   Judge Brown | | docketing deputy initials | |
| | courtroom deputy's initials | U.S. DISTRICT COURT   2005 JAN 12 PM 5:42 | JAN. 12, 2005 date mailed notice | |
| | | Date/time received in central Clerk's Office | mqm mailing initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED

JAN 1 3 2005

IRENE ABRAMS, on behalf of      )
herself and all others          )
similarly situated,             )
                                )
            Plaintiffs,          )
                                )
      v.                         )      No. 01 C 7538
                                )
VAN KAMPEN FUNDS, INC.,          )
VAN KAMPEN INVESTMENT ADVISORY   )
CORPORATION, VAN KAMPEN PRIME    )
RATE INCOME TRUST, RICHARD F.    )
POWERS, III, STEPHEN L. BOYD, and )
DENNIS J. McDONNELL,             )
                                )
            Defendants.          )

## MEMORANDUM OPINION AND ORDER

### A. BACKGROUND

This is a consolidated class action alleging federal
securities violations involving defendant Van Kampen Prime Rate
Income Trust's (the "Fund") valuation of senior loans and is
subject to the Private Securities Litigation Reform Act of 1995
("PSLRA"), 15 U.S.C. § 77z-1.  A class has been certified
consisting of all persons who purchased shares in the Fund
between September 30, 1998 and March 26, 2001, inclusive, with

defendants and certain related parties excluded. <u>See</u> <u>Abrams v.</u>
<u>Van Kampen Funds, Inc.</u>, 2002 WL 1989401 (N.D. Ill. Aug. 27, 2002)
("<u>Abrams II</u>"). Named as defendants are the Fund; Van Kampen
Funds, Inc. ("Van Kampen"), the Fund's administrator; Van Kampen
Investment Advisory Corp. (the "Adviser"), the Fund's investment
adviser; Richard Powers, Fund Chairman of the Board, President,
and Trustee during the relevant time period; Dennis McDonnell,
former Fund Chairman of the Board, President, and Trustee and
Fund Portfolio Manager from July 1999 until December 1999; and
Stephen Boyd, Fund Executive Vice President and Chief Investment
Officer and Adviser Officer during the relevant time period.
Count I of the Consolidated Amended Complaint alleges violations
of § 11 of the Securities Act, 15 U.S.C. § 77k, against Van
Kampen, the Fund, Powers, McDonnell, and Boyd. Against Van
Kampen and the Adviser, Count III alleges control person
liability under § 15 of the Securities Act, 15 U.S.C. § 77o,
based on the alleged § 11 violations.[1] Following a ruling on the
parties' cross motions for summary judgment, <u>see</u> <u>Abrams v. Van</u>
<u>Kampen Funds, Inc.</u>, 2004 WL 1433620 (N.D. Ill. June 25, 2004)

---

[1]Claims for violations of § 12 of the Securities Act, 15
U.S.C. § 77l, and state law claims, as well as claims against two
individual defendants, were voluntarily dismissed. Following
notice and a fairness hearing, the voluntary dismissal of those
claims was approved by the court. <u>See</u> Order dated Dec. 8, 2004.
<u>See also</u> <u>Abrams v. Van Kampen Funds, Inc.</u>, 2004 WL 1433620 *1
n.1, *9 n.3 (N.D. Ill. June 25, 2004).

("Abrams III"), the parties filed their final pretrial order. Pending are the parties' various motions in limine.

Plaintiffs contend that defendants violated § 11 by making the following misrepresentations in various prospectuses that were issued during the class period. First, plaintiffs contend that defendants misrepresented the value of shares of the Fund in that they overvalued the loans held by the Fund. Plaintiffs contend that using available market quotations and properly determining fair value based on what the loans would have currently sold for would have resulted in lower daily net asset values ("NAV") for the Fund. Second, plaintiffs contend the prospectuses contained misrepresentations that the Fund used market quotations where available when this was not done.[2]

To succeed on their § 11 claims, plaintiffs must show that defendants were responsible for untrue statements of material fact or omitted material facts in a prospectus. See Herman & MacLean v. Huddleston, 459 U.S. 375, 381-82 (1983); Abrams III, 2004 WL 1433620 at *1; Ong v. Sears, Roebuck & Co., 2004 WL 2534615 *16 (N.D. Ill. Sept. 27, 2004). There is no scienter or reliance requirement; instead responsible persons are liable for the material and misleading statements contained in a prospectus unless they can affirmatively make certain showings as

_____

[2]Allegations regarding misrepresentations as to the Fund's goals were dismissed on summary judgment. See Abrams III, 2004 WL 1433620 at *9.

- 3 -

to their knowledge and diligence. See Herman, 459 U.S. at 382;
Abrams III, 2004 WL 2534615 at *1; Ong, 2004 WL 2534615 at *16.
A misstatement is material if there is a substantial likelihood
that it would be viewed by a reasonable investor as significantly
altering the total mix of available information and thus
important to the investor's decision to invest. TSC Industries,
Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976); Abrams III,
2004 WL 1433620 at *1; Ong, 2004 WL 2534615 at *32.

Here, a central issue for plaintiffs' claims is the
method of valuing the senior loans held by the Fund. The parties
do not dispute that the applicable general principle is that the
loans were to be valued on a daily basis at the amount that could
have been obtained from a current sale. See SEC Accounting
Release Series No. 118, 1970 WL 5621 *4 (Dec. 30, 1970) ("ASR
118"); Abrams III, 2004 WL 1433620 at *2; In re Allied Capital
Corp. Securities Litigation, 2003 WL 1964184 *1 (S.D.N.Y.
April 25, 2003); In re Eaton Vance Corp. Securities Litigation,
206 F. Supp. 2d 142, 151-52 (D. Mass. 2002). See also 15 U.S.C.
§ 80a-2(a)(41)(B); 17 C.F.R. § 270.2a-4(a). The parties also
agree that current value is to be determined by "market
quotations" where "readily available," or by "fair value" methods
if market quotations are not readily available. See 15 U.S.C.
§ 80a-2(a)(41)(B); 17 C.F.R. § 270.2a-4(a)(1); ASR 118, 1970 WL
5621 at *3; Abrams III, 2004 WL 1433620 at *2; Eaton Vance, 206
F. Supp. 2d at 147. Regarding the class period, the parties

disagree as to whether the pricing services that were then available qualified as readily available market quotations. To qualify as readily available market quotations that must be used to value securities, the pricing services must provide quotes that are sufficiently timely, sufficiently frequent, and sufficiently accurate. Abrams III, 2004 WL 1433620 at *2; Eaton Vance, 206 F. Supp. 2d at 148-49. On summary judgment, it was held that genuine factual disputes existed as to when market quotations first became readily available. See Abrams III, 2004 WL 1433620 at *4-6. It was also held that genuine factual disputes existed as to defendants' affirmative defense that they acted with due diligence in exercising their business judgment in determining that market quotations were not yet readily available. See id. at *6. Additionally, it was held that genuine factual disputes existed as to whether defendants determined the value of loan assets in the manner described in the pertinent prospectuses. See id. at *7-8. The parties' agreed statement of contested issues of fact and law is consistent with the foregoing. See Proposed Final Pretrial Order Exh. B.

In light of the contested issues and other background described above, rulings will be made as to the pending motions in limine. Plaintiffs' motions in limine will be considered first.

## B. PLAINTIFFS' MOTIONS IN LIMINE

## 1. To Bar Evidence that Traders Issued False Loan Pricing Data [138-1]

Defendants contend that certain pricing services were unreliable because they were based, in part, on market participants reporting the price at which they would sell or purchase loans, not actual sales. Defendants contend such reports were particularly unreliable because a significant number of market participants would overstate or understate the price so as to gain an advantage when actually selling or buying. Plaintiffs seek to bar any evidence of such manipulative price reporting on the ground that any such evidence is hearsay based on rumors, with there being no potential testimony based on personal knowledge.

Defendants contend that Allison Taylor can properly provide such testimony. She is a former senior loan trader, a founding member of the Loan Syndication and Trading Association ("LSTA"),[3] LSTA's initial Chairman, and, since 1998, the executive director of LSTA and LSTA/LPC. Defendants contend she can testify from personal experience and knowledge regarding her observations as to how LSTA/LPC functions. Defendants also point to disclaimers on LSTA/LPC forms regarding the pricing being

---

[3]LSTA is a senior loan pricing service first formed in 1995. In 1999, it merged with the Loan Pricing Corporation ("LPC"), which had began gathering data on senior loans in 1985. See Abrams III, 2004 WL 1433620 at *5-6.

based on estimated values provided by dealers, not necessarily actual trades. Taylor certainly can testify as to LSTA/LPC's procedures and methodologies. The question is whether any testimony that she believes market participants manipulated price reports would be inadmissible speculation or an observation based on personal experience.

Since neither party provides Taylor's deposition testimony that is pertinent to this motion[4], this issue cannot be resolved on the documents before the court. If Taylor were to testify that others told her participants were manipulating their price reports, that would be inadmissible hearsay. If she were to testify that she determined that actual participants were manipulatively reporting prices, that would likely be testimony based on personal observations. As long as there is a proper foundation, she could report such observations and conclusions. She need not be an expert to provide such testimony. See Fed. R. Evid. 701. At this time, with a very limited description of the testimony, no ruling can be made as to the admissibility of Taylor's testimony on this subject. Also, a question remains as to whether defendants actually relied on Taylor's findings.

Defendants also contend that they have "corroborating evidence" that is consistent with Taylor's observations. This

---

[4]Short excerpts of Taylor's deposition testimony in this case and another case are provided regarding other motions in limine.

consists of testimony from Van Kampen representatives regarding conversations with senior loan market participants making clear they had no intention of honoring bids or asks they had reported and an email from a Citibank trader expressing concerns about price reporting manipulation. Defendants do not contend that this evidence is admissible to prove the truth of the matters reported by the participants and Citibank trader. They instead contend that it is admissible to show defendants' reasoning in not accepting certain price information. Plaintiffs contend that is an irrelevant purpose because intent need not be shown to prove a § 11 violation. However, information available to defendants would be relevant to defendants' business judgment defense. This evidence will not be excluded. If desired, plaintiffs may submit a proposed limiting instruction regarding the jury's use of this evidence.

This motion in limine will be denied as to the "corroborating evidence." As to Taylor's testimony, the motion will be denied without prejudice to raising objections at trial.

## 2. To Exclude the Testimony of Kevin Meenan and Anthony DeLuca [139-1]

At trial, defendants intend to call Kevin Meenan as a witness and may call Anthony DeLuca. Meenan started a senior loan pricing service while working for his own firm. That firm was later purchased by Societe Generale Bank ("SocGen") and Meenan continued to provide pricing services through SocGen.

SocGen was one of the pricing services used by the Fund. DeLuca was a managing director for Morgan Stanley, the parent of Van Kampen. In 1999, DeLuca conducted a review of third-party pricing of senior loans, including pricing by LPC, and reported his findings to Van Kampen's Board.

Plaintiffs object to both witnesses on the ground that they were not disclosed in response to interrogatories. Plaintiffs also contend that these two would be expert witnesses, but were not disclosed as such and no expert reports were provided. Defendants contend they did not have to update their interrogatory responses because these two potential witnesses were disclosed to plaintiffs during deposition testimony. Defendants contend they are fact witnesses, not experts.

There is no dispute that Meenan and DeLuca were omitted from certain discovery responses for which their names and knowledge or involvement would have been responsive to the queries. However, defendants were not required to supplement those prior responses if the corrective information was otherwise made known to plaintiffs during the discovery process. See Fed. R. Civ. P. 26(e). Also, even if there was an improper failure to disclose, the evidence should not be excluded if the nondisclosure was harmless. Here, Meenan's role at SocGen was disclosed during two depositions, including a Van Kampen Vice President testifying that Meenan was the person at SocGen most knowledgeable about third-party pricing. DeLuca's involvement in

the review was disclosed in the deposition of Van Kampen's General Counsel and the Board minutes for the meeting at which he made his report. Meenan's and DeLuca's knowledge and potential as witnesses were adequately disclosed during discovery. Therefore, defendants were not obliged to supplement their prior interrogatory responses.

Plaintiffs still complain that the witnesses were not disclosed as providing expert testimony. Since these witnesses were not retained or specially employed to provide expert testimony, the requirement of providing an expert report cannot apply to their testimony. See Fed. R. Civ. P. 26(a)(2)(B); Musser v. Gentiva Health Services, 356 F.3d 751, 756-57 (7th Cir. 2004). If some of their testimony would include opinions "based on scientific, technical, or other specialized knowledge," then they should have been disclosed as expert witnesses in accordance with Fed. R. Civ. P. 26(a)(2)(A). Musser, 356 F.3d at 756 & n.2.

It is doubtful that Meenan and DeLuca would be testifying as experts. Like Taylor, Meenan can testify about practices at SocGen, including drawing conclusions and expressing some opinions about what happened there, without having to rely on scientific, technical, or specialized knowledge. And even if his testimony could be properly characterized as including some expert testimony, the deposition testimony disclosing his role at SocGen would have served to disclose that possibility. Meenan's testimony would not be excluded for failure to name him as an

expert. DeLuca's testimony also does not appear likely to include expert testimony. Presumably he will testify as to what he reported to the Board and possibly as to methods he used during his investigation. But, even if some of DeLuca's testimony is properly classified as expert testimony, his potential testimony was also adequately disclosed. His testimony will not be excluded.

Although there was discovery in which Meenan and DeLuca were disclosed and therefore no technical violation of Rule 26, defendants still should have clarified to plaintiffs that Meenan and DeLuca were potential witnesses, especially if defendants have any intention of eliciting expert testimony from either witness. Counsel for defendants likely were aware of Meenan's and DeLuca's roles prior to their names being mentioned at depositions and should have disclosed them prior to the depositions. Moreover, as plaintiffs point out, they were limited as to the number of witnesses they were permitted to depose and therefore focused on persons who were expressly named by defendants as potential witnesses. Had Meenan and DeLuca been expressly identified by defendants, plaintiffs may have chosen to depose one or both of them. The court will exercise its discretion to reopen discovery for the limited purpose of permitting the deposition of these two witnesses. However, DeLuca is listed as a possible witness, not a definite witness. If defendants represent to plaintiffs that they have decided not

to use him as a witness, plaintiffs will not be permitted to depose DeLuca and defendants will not be permitted to present him at trial.

For the foregoing reasons, this motion in limine will be granted in part and denied.  Plaintiffs may depose Meenan and DeLuca within 45 days after the date of today's order.

### 3.  To Exclude the Testimony and Report of Michael P. McAdams [140-1]

Michael P. McAdams, whom defendants intend to use as an expert witness, has more than 20 years of experience in investment management and banking.  From its inception in 1988 until 1995, he managed Pilgrim Prime Rate Trust, the first retail, floating-rate loan fund.  Since 1995, he has had high-level positions at two other asset management firms.  He was an early member of LSTA and has served on its Board, including as Chairman of the Board.  He has also been a member of LSTA's valuation project committee.  Plaintiffs do not dispute that he has the credentials to be an expert in the field of senior loans. However, plaintiffs contend that the opinions expressed in his expert report are not adequately supported and therefore he does not meet the requirements to testify as an expert that are set forth in Fed. R. Civ. P. 702 and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).[5]

---

[5]Although the title of plaintiffs' motion refers to excluding McAdams's report, the request for relief refers only to excluding his testimony.  The report itself would not be

In 2000, Rule 702 was amended to conform with <u>Daubert</u> and its progeny, including <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137 (1999). Expert testimony is not to be presented to a jury unless "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts in the case." Fed. R. Evid. 702. <u>Daubert</u>, 509 U.S. at 592-94, sets forth a list of factors to consider in determining reliability. The list is not definitive; particular factors in that list may or may not be pertinent in evaluating particular expert testimony. <u>Kumho</u>, 526 U.S. at 150-51 (quoting <u>Daubert</u>, 509 U.S. at 593); <u>United States v. Romero</u>, 189 F.3d 576, 584 (7th Cir. 1999), <u>cert. denied</u>, 529 U.S. 1011 (2000). The Rule 702 inquiry is "flexible." <u>Kumho</u>, 526 U.S. at 150 (quoting <u>Daubert</u>, 509 U.S. at 594). The flexibility of the inquiry is particularly important to keep in mind when the field of expertise is not a scientific one as in <u>Daubert</u>. <u>See Romero</u>, 189 F.3d at 584; <u>Pease v. Production Workers of Chicago & Vicinity Local 707</u>, 2003 WL 22012678 *4 (N.D. Ill. Aug. 25, 2003). In determining the reliability of the proffered testimony, the focus must be on the soundness of the methodology that is used, not on whether the conclusions that the expert reaches are correct. <u>Deputy v. Lehman Brothers, Inc.</u>, 345 F.3d

_____

admissible evidence absent a stipulation by the parties that the report itself represents McAdams's testimony.

494, 506 (7th Cir. 2003); Dewick v. Maytag Corp., 324 F. Supp. 2d 894, 898 (N.D. Ill. 2004); Pease, 2003 WL 22012678 at *4.

McAdams presently offers the following five opinions:[6]

> 2. Market quotations in the traditional sense--i.e. prices that reflect where bona fide transactions between willing buyers and sellers actually took place or where a buyer or seller definitely would transact business--do not exist in the senior loan market except in the most unusual and unpredictable circumstances. Market indications are not the same thing as market quotations.
> 3. From September 1998 through January 25, 2000, Van Kampen's method of valuing senior loans, and particularly how it used third-party pricing data when and if it was reasonably available, was consistent with the markets' development at that time and was consistent with the methodology set forth in the prospectus.
> 4. In January 2000, Van Kampen's decision to base its fair value determinations on LSTA/LPC indications where there were at least three bids, three asks and a spread of less than 100 basis points was reasonable given the market's development at that time and was consistent with the methodology set forth in the prospectus.
> 5. In November 2000, Van Kampen's decision to base its fair value determinations on LSTA/LPC indications where there were at least two bids, two asks and a spread of less than 200 basis points, was reasonable given the status of the market's development at that time, and was consistent with the methodology set forth in the prospectus.
> 6. In making its fair value determinations, Van Kampen made a good-faith effort to consider factors important to an arms-length [sic] buyer in assessing what they would pay for the loans on a current sale.

McAdams Report at 5-6 (April 4, 2003).

---

[6]The opinion numbered 1 is no longer at issue following the court's ruling on summary judgment.

- 14 -

Plaintiffs do not dispute that McAdams is an expert in the field. His experience qualifies him to testify as to how pricing services function, particularly how LSTA/LPC functioned. Opinion 2 is essentially descriptive and historical. It does not require applying any sort of testing or statistical methodology in order to be reliable. This opinion also does not involve a particularized application to the Fund's procedures. Therefore, questions that plaintiffs raise regarding McAdams's knowledge of the Fund's procedures are not pertinent to this opinion. McAdams's experience is enough to support reliability as to Opinion 2. Cf. Den norske Bank AS v. First National Bank of Boston, 75 F.3d 49, 57-58 (1st Cir. 1996) (employee of defendant bank with 40 years of banking experience was qualified to testify as to banking industry practices); Dahlin v. Evangelical Child & Family Agency, 2002 WL 31834881 *6-7 (N.D. Ill. Dec. 18, 2002) (expert was qualified to testify as to history of adoption practices and information being provided to adoption professionals at various periods of time).

Opinion 3 is different than Opinion 2. While it still requires an expert understanding of the pricing services that were available, it also requires an understanding of the Fund's actual practices. Plaintiffs contend that McAdams was not fully informed as to the Fund's practices because defendants did not supply him with all the pertinent evidence. Plaintiffs also contend that this opinion is unreliable because McAdams never

examined the Fund's particular valuations to determine if they were accurate.

Plaintiffs contend that McAdams is not qualified to opine as to whether the Fund's practices corresponded with pricing resources available in the market because McAdams has insufficient knowledge of the Fund's actual practices. In particular, plaintiffs complain that (a) McAdams has not read a July 1999 PricewaterhouseCoopers LLC ("PwC") review of the Fund's valuation practices and (b) at his deposition, McAdams could not recall SEC correspondence questioning the Fund's valuation methods. While familiarity with the PwC report may have provided McAdams with additional information about the Fund's actual practices, the other documents that he was provided should have been sufficient to allow McAdams to be familiar with the practices. His lack of complete familiarity and recall goes more to the weight of his opinion, not whether it is admissible. The jury will be able to determine whether McAdams's assumptions about actual practices of the Fund correspond with the evidence of actual practices that will be presented at trial. Similarly, to the extent the SEC correspondence sets forth factual findings and not legal analysis, McAdams's failure to recall details of the correspondence goes to the weight to be given his testimony and the jury will resolve factual questions as to the actual practices that were in place. Plaintiffs do not contend that McAdams was not shown the correspondence when preparing his

report, only that, at the time he was disposed, he could not recall having seen it.

The other issue raised by plaintiffs is that McAdams should not be permitted to testify about the Fund reasonably applying valuation methods when he never tested the accuracy of the valuations. Plaintiffs contend McAdams is not qualified to testify as to the efficacy of the Fund's actual valuation procedures because he made no comparison between the values given to particular loans and the prices the loans may have sold at during the same time period. According to McAdams's admissible testimony, however, there is only limited available data as to actual prices that loans sold for in the secondary market. Plaintiffs would like to rely on pricing information provided by LSTA/LPC and other services as being accurate, but the accuracy of those prices is a question of fact for the jury. McAdams may properly testify that the valuation practices of the Fund complied with the price information for loans that was contemporaneously available. Plaintiffs may cross examine him as to the lack of any price comparison study in order to raise questions as to the weight or credibility of his testimony, but that is not enough to make his testimony inadmissible.

Plaintiffs also generally raise the contention that McAdams's opinions are conclusory and lack supporting details. See generally Mid-State Fertilizer Co. v. Exchange National Bank of Chicago, 877 F.2d 1333, 1339-40 (7th Cir. 1989). McAdams's

discussion of Opinion 3, however, is sufficiently detailed and not conclusory. See McAdams Report at 21-24.

There is one aspect of Opinion 3 as to which McAdams will not be permitted to testify. He opines that the Fund's actual valuation practices were consistent with the description of those practices contained in the prospectuses. That is a purely factual question of comparing the evidence of actual practices with the descriptions contained in the prospectuses. No expertise is required to make such a comparison. McAdams's testimony as to this issue would not assist the jury. McAdams will not be permitted to testify as to that aspect of Opinion 3.

Opinions 4 and 5 both concern whether the particular practices involved, the "3 x 3 x 100 screen" and "2 by 2 x 200 screen," see Abrams III, 2004 WL 1433620 at *6, were reasonable in light of pricing information then available in the market. His testimony concerns the reasonableness of each particular practice in light of then-available information, not whether the Fund's actual application produced accurate valuations. McAdams may properly testify as to these opinions. As with Opinion 3, however, McAdams will not be permitted to testify as to whether the Fund's actual practice was consistent with the descriptions of the practices contained in the prospectuses.

Although McAdams's summarized statement of Opinion 6 refers only to the Fund's good-faith intent, the specifics of this opinion explain why it is unnecessary to discount from the

par value of a loan to take into account the illiquid nature of senior loans. He opines that the "illiquidity discount" is taken into account at the time par is first set. He also opines as to the effect on the value of a loan that a breach of a bank covenant or a bankruptcy filing may have. McAdams may testify regarding his opinions on these subjects. However, he will not be permitted to testify as to whether he believed any defendant acted in good faith in determining the price an arm's length buyer would pay for a loan. That is a factual issue of intent that is for the jury to decide. The jury's determination of intent would not be assisted by McAdams's opinion on that issue. See Dahlin, 2002 WL 31834881 at *3.

For the foregoing reasons, this motion in limine will be granted in part and denied in part. This motion will be denied except that McAdams will not be permitted to testify as to (a) whether any actual valuation practice of the Fund is consistent with a description of the practice contained in a prospectus nor (b) whether any defendant acted in good faith or with some other type of intent.

## 4. To Exclude Testimony of Expert Witnesses Daniel R. Fischel and David J. Ross [141-1]

Defendants intent to use Daniel Fischel and David Ross as damages liability experts. The two provided a joint report, but defendants now clarify that they intend to have Fischel testify regarding two of the opinions expressed therein and Ross testify

as to one. Plaintiffs argue that neither of the witnesses should be allowed to testify as to one of the opinions. Plaintiffs also argue that the two witnesses are duplicative and only one should be permitted to testify.

Both experts are officers of Lexecon Inc., a consulting firm that specializes in the application of economics to legal and regulatory issues. Plaintiffs do not question the qualifications of either of these experts. Plaintiffs only question the methodology used to reach the conclusions contained in Opinion 1 below.[7]

Fischel and Ross were retained to examine the conclusions set forth by plaintiffs' valuation expert, Linda Allen, and damages expert Michael J. Barclay. Allen opines as to the amounts by which the Fund overvalued its NAV during the class period. Barclay, in part based on Allen's overvaluation calculations, provides a calculation of damages to the class of plaintiffs.

As summarized by defendants, Fischel's and Ross's opinions and defendants' contention as to the related evidence they will submit may be summarized as follows:

Opinion 1: Barclay's calculations do not account for factors other than the alleged wrongdoing that caused the Fund's NAV to decline during the Class Period. The experts opine that

_____

[7]In a separate motion in limine, plaintiffs also object to an aspect of Opinion 2. See § B(5) infra.

adverse market conditions account for all or a substantial
portion of the decline in NAV, in particular an increase in loan
default rates and a widening credit spread.  Defendants intend to
introduce testimony regarding Opinion 1 through Fischel.  This
will include evidence that is intended to show that all senior
loan funds and a published index of senior loans experienced
declines in value comparable to the decline in the NAV of the
Fund.

    Opinion 2:  Barclay's calculations do not measure the
class's economic loss attributable to the alleged overpricing of
the Fund.  A drop in NAV does not strictly correlate with
economic loss to the class plaintiffs.  Defendants intend to
introduce testimony regarding Opinion 2 through Fischel.
Defendants will present evidence that they contend will show that
Barclay's methodology for calculating damages is flawed because
it creates windfall recoveries that bear no relationship to the
alleged overpricing of the Fund's shares.

    Opinion 3:  On the assumption that the Fund should have
used LPC prices, Ross calculates the amount that the NAV was
overvalued to be somewhat different from Allen's initial
calculation.  Ross then uses this overvaluation calculation and a
different methodology than Barclay to calculate the amount of
purported damages to be substantially less than Barclay's total.
Ross proposes a number of alternative calculations based on
different methods or assumptions.  In their report, this Opinion

is stated to be that of Ross only.  Defendants intend to
introduce testimony regarding Opinion 3 through Ross.

In Opinion 1, defendants' experts rely on a Standard &
Poor/Loan Syndication and Trading Association ("S&P/LSTA") index
of loans to establish an increase of loans in default or
bankruptcy during the pertinent time period, from near zero in
1996 to significantly higher from 1999 through 2001.  As stated
in their report:  "An increase in default rates obviously will
reduce the value of senior loans and the value of funds holding
such loans."  Fischel & Ross Report at 6 (April 30, 2003).  They
also rely on the London Interbank Offered Rate ("LIBOR") to
establish an increasing credit spread between October 1998 and
October 2001.  LIBOR is the rate at which major international
banks in London lend dollars to each other and is often used as a
benchmark for floating rates.  The credit spread relied upon is
the difference between the yield of leveraged loans and LIBOR.
As stated by defendants' experts:  "Because there is an inverse
relationship between the price of any given loan and the relevant
credit spread, the increase in credit spreads also reduced the
value of senior loans and the value of funds holding such loans."

Plaintiffs do not dispute the general principles that
increased default rates and an increased credit spread will
result in a general decline in the value of floating-rate loans,
nor do they dispute that default rates and the credit spread
increased during the pertinent time period.  Plaintiffs, however,

object that the experts failed to apply any methodology for connecting the general economic conditions to an effect on senior loans in general or the Fund's NAV in particular. The experts provide no data purporting to show how much of the Fund's drop in NAV was caused by these conditions. The experts do not give any consideration to the actual loans held by the Fund nor do they attempt to correlate the Fund's NAV changes over the class period with particular changes in economic conditions during the class period. Under § 11, decreases in the value of the security are presumed to be caused by the material misstatements that are shown. McMahan & Co. v. Wherehouse Entertainment, Inc., 65 F.3d 1044, 1048 (2d Cir. 1995), cert. denied, 517 U.S. 1190 (1996); In re Dynegy, Inc. Securities Litigation, 339 F. Supp. 2d 804, 867 (S.D. Tex. 2004); In re Initial Public Offering Securities Litigation, 241 F. Supp. 2d 281, 351 n.80 (S.D.N.Y. 2003). If plaintiffs prove liability, the burden is on defendants to show that drops in NAV were caused by something other than the alleged misstatements in the prospectuses.[8] 15 U.S.C. 77k(e); In re Adams Golf, Inc. Securities Litigation, 381 F.3d 267, 277 (3d Cir. 2004); McMahan, 65 F.3d at 1048; Dynegy, 339 F. Supp. 2d at 867-68; Nielsen v. Greenwood, 1996 WL 563539 *12 (N.D. Ill. Oct. 1, 1996). Here, however, the experts do not attempt to connect changes in loan default rates and the credit spread to

_____

[8]This is often referred to as the defense of "negative causation." See McMahan, 65 F.3d at 1048.

- 23 -

changes in the Fund's NAV nor do they make any attempt to show how much of an effect there may have been. Therefore, it has not been shown that this testimony is relevant to the damages issues in this case.

Defendants' experts do point to general data regarding decreases in loan values and senior loan fund NAV's during the class period. The loan indices used, however, do not index senior loans. Instead, the indices used were for all loans, B-grade loans, and BB-grade loans. While there is some overlap between the indices used and the types of loans held by the Fund, apparently none of the indices correspond with the mix of loans held by the Fund. Fischel and Ross do not explain the correlations or possible differences between the indices used and the assets of the Fund. Also, Fischel and Ross provide no statistical or other sufficient method for correlating changes in the indices to changes in default rates or credit spreads.[9] As to other senior loan funds, the experts generally do not consider similarities and differences with the Fund nor whether the other funds may or may not have overstated NAV.

Because not supported by adequate methodology nor shown to be relevant to issues in the present case, Fischel and Ross will not be permitted to testify regarding Opinion 1.

_____

[9]In rebuttal, Barclay opines that multiple regression analysis shows a lack of statistically significant correlations between the indices and changes in the Fund's NAV.

Still to be considered is whether both Fischel and Ross will be permitted to testify. Defendants agree that ordinarily only one expert per side should opine on a particular subject. See N.D. Ill. Loc. R. Form 16.1.1 n.7; Dahlin, 2002 WL 31834881. Defendants contend, however, that Fischel will testify as to Opinion 2 and Ross as to Opinion 3. The two opinions, however, are closely related. Ross will not be able to opine as to Opinion 3 without also addressing many aspects of Opinion 2. Defendants will be precluded from using both experts. They may choose which expert they prefer to use.[10]  See id.

For the foregoing reasons, this motion in limine will be granted in part and denied in part. Fischel and Ross will be barred from testifying as to Opinion 1 and defendants will be limited to using one expert to testify as to the remaining opinions contained in the Fischel/Ross Report.

## 5. To Preclude Evidence and Argument Concerning Dividends Paid by the Van Kampen Prime Rate Income Trust to Shareholders [142-1]

Section 11 itself contains a provision as to damages for violations of § 11(a).

> The suit authorized under subsection (a) of
> this section may be to recover such damages as
> shall represent the difference between the amount

---

[10]Fischel did not join in Opinion 3. Therefore, testimony as to both Opinions would probably require the use of Ross. No ruling is made as to whether Fischel could testify as to Opinion 3 if, prior to trial and because he fully agrees with Ross as to Opinion 3, he supplements his report by adopting Opinion 3 as well.

paid for the security (not exceeding the price at which the security was offered to the public) and (1) the value thereof as of the time such suit was brought, or (2) the price at which such security shall have been disposed of in the market before suit, or (3) the price at which such security shall have been disposed of after suit but before judgment if such damages shall be less than the damages representing the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and the value thereof as of the time such suit was brought: Provided, That if the defendant proves that any portion or all of such damages represents other than the depreciation in value of such security resulting from such part of the registration statement, with respect to which his liability is asserted, not being true or omitting to state a material fact required to be stated therein or necessary to make the statements therein not misleading, such portion of or all such damages shall not be recoverable. . . .

15 U.S.C. § 77k(e).

As discussed in § B(4) supra, the decrease in value of a security (in this case, effectively the decrease in NAV of the Fund) is presumed to have been caused by any material misstatements that are proven to have been included in one or more of the Fund's prospectuses. On the issue of damages, the burden is on defendants to prove that any such decrease was caused by factors other than the material misstatements. The decrease in value of the security (during the relevant time period) is the exclusive measure of damages for violations of § 11(a); other standard measures of contractual damages are inapplicable under the statute. McMahan, 65 F.3d at 1048; Goldkrantz v. Griffin, 1999 WL 191540 *3 (S.D.N.Y. April 6, 1999), aff'd by unpublished order, 201 F.3d 431 (2d Cir. 1999).

Defendants want to introduce evidence that members of the plaintiff class received dividend payments from the Fund. They contend that evidence would show that an investor who held a single share of the Fund during the class period would have had a drop in NAV of $1.18, but also would have received $1.69 in dividends for a net gain of $0.51 on the share. Defendants contend this evidence will fit into the statutory method for measuring damages because the receipt of dividends is part of their evidence showing negative causation. Defendants contend that paying dividends caused a decrease in the Fund's NAV. They point to a conclusory statement in their damages experts' report as supporting this contention. <u>See</u> Fischel & Ross Report at 8 n.7 (April 30, 2003) ("Professor Barclay's calculations do not measure Class members' out-of-pocket losses because he ignores the dividends paid by the Fund to its shareholders."). <u>See also</u> Ross Suppl. Report at 8-9 (Oct. 17, 2003) ("I understand that the defendants contend that plaintiffs cannot recover under Section 11 for declines in the value of a security attributable to factors other than the alleged material misstatements and omissions. If defendants' contention is correct, then an offsetting adjustment for dividend payments should be made, because the payment of dividends necessarily caused the value of the fund to decline by the amount of dividends paid.").

In a somewhat lengthier, but still essentially conclusory manner, plaintiffs' damages expert stated that the payment of dividends does not decrease NAV. As he sees it, the effect of

dividends on NAV is that retaining dividends, instead of
distributing them, would increase NAV.

> Q.  And if a fund pays out dividends, what
> impact, if any, would that have on the NAV Of the
> fund?
>                          * * *
> A.  At some level, it's correct that a
> dividend paid on the fund would reduce the NAV of
> the fund.  However, it's clear from looking at
> the fund's NAV that it was possible to pay these
> dividends over a long period of time without
> having the fund's NAV vary from $10 per share by
> more than a penny or two.
> So what happens in these cases is that the
> senior loans held by the fund pay interest to the
> fund.  The fund takes those interest payments
> that are received from the loans and passes them
> through to investors.
> So rather than thinking about the dividends
> as reducing NAV, which clearly they didn't over
> the history of the fund prior to the class
> period, since the fund's NAV never varied by more
> than a couple of pennies from $10 per share, what
> you're doing is paying out those dividends rather
> than retaining them in the fund and reinvesting
> them which, in fact, would tend to increase the
> fund's NAV.

Barclay Dep. at 75-76.

One issue that goes to the admissibility of the testimony
is whether the potential effect of dividends on NAV is a question
of law as to the measure of damages or a question of fact as to
whether or not paying dividends affects NAV.  Here, the Fund's
stated goal was to achieve a high level of current income
consistent with preservation of capital.  If, as Barclay
indicates, dividends simply represented the distribution of
interest earned on the loans, such a distribution would be
independent of the value of the shares themselves that is
represented by NAV.  Defendants point to no evidence that this is

not true. Therefore, for purposes of ruling on this motion in limine, it is assumed that dividends represented interest earned on the loans and were separate from the loan asset itself that represented the value of the Fund's shares. Therefore, as a matter of law, the payment of dividends would not be part of the calculation of damages based on a decline in share value (NAV).

Even if that should not taken as true, defendants have not shown that they have admissible evidence that the distribution of dividends negatively affected NAV. All they can point to is conclusory statements by their damages experts. Such unsupported, conclusory statements are not admissible evidence. See Huey v. United Parcel Service, Inc., 165 F.3d 1084, 1087 (7th Cir. 1999); Mid-State Fertilizer, 877 F.2d at 1339-40; Ab v. Sekendur, 2004 WL 2434220 *6 (N.D. Ill. Oct. 28, 2004); Comer v. American Electric Power, 63 F. Supp. 2d 927, 936-37 (N.D. Ind. 1999). Alternatively, since the evidence related to the effect of distributing dividends is inadmissible in form, defendants will not be permitted to present it.

Defendants also argue that evidence as to dividends is admissible so that the jury will have a complete picture. They contend that the jury should know that class members received dividends as well as any proceeds from the redemption of their shares. Defendants contend the jury may make a decision based on sympathy for the plaintiffs if the jury believes the plaintiffs had a net loss. The jury will be instructed that they are not to decide the case based on sympathy for a party. Since, as

discussed above, dividends are not relevant to calculating damages, there is no reason for the jury to know the amount of dividends received by class members. Defendants will not be permitted to present evidence regarding the amount of dividends distributed by the Fund. As part of the basic background for this case, including evidence as to how the Fund functioned, the parties are not precluded from presenting evidence that the loans held by the Fund earned interest and that the interest was distributed in the form of a dividend. The parties are only prohibited from presenting evidence as to the amount of the dividend and any effect the distribution of dividends may have had on the Fund's NAV.

For the foregoing reasons, this motion in limine will be granted. The parties will not be permitted to present evidence as to the amount of dividends that the Fund paid nor will they be permitted to argue that any distribution of dividends affected the Fund's NAV or the amount of damages to be awarded in this case. This includes that Fischel or Ross will not be permitted to testify as to the aspect of Opinion 2 that is based on the distribution of dividends affecting NAV and damages.

## C. DEFENDANTS' MOTIONS IN LIMINE

### 1. To Exclude the Testimony and Report of Linda Allen [137-1]

Plaintiffs' valuation expert, Linda Allen, has a Ph.D. in Economics and Finance from New York University and is currently a Professor of Finance at Baruch College of the City University of

New York and an Adjunct Professor of Finance at New York
University.  She is the author or coauthor of three books and
numerous articles, primarily in the field of loan valuation and
credit risk analysis.  Her books include <u>Understanding Market,
Credit and Operational Risk:  The Value at Risk Approach</u> and
<u>Credit Risk Measurement:  New Approaches to Value at Risk and
Other Paradigms</u>.

Allen opines that, during the class period, the LPC
database was a reliable benchmark of market prices for a majority
of the loans held by the Fund.  She bases this opinion on "(a)
the number, sophistication and financial resources of dealers
providing market quotations to LPC, (b) the number of quotes
provided for each loan, (c) the quality controls put in place by
LPC in response to the demand for quality by its customers,
(d) the general acceptability of the database in the market,
(e) the general acceptability of the database for the purposes of
academic research, and (f) the internal studies conducted by LPC
comparing LPC quotations to actual trade prices."  Additionally,
Allen opines that, during the class period, there was a secondary
loan market for syndicated bank loans and readily available
market quotations for a majority of the loans in the Fund's
portfolio.  The latter conclusion was based in part on data
regarding the average number of bid quotes and ask quotes
available for loans held by the Fund.  Further, taking available
LPC pricing data as accurate, Allen recalculated NAV for each day
of the class period and determined how much NAV was overvalued on

each day of the class period. She also compared LPC pricing data to the Fund's valuation of its loans, resulting in statistically significant evidence that the Fund generally overvalued loans.

Defendants do not dispute that Allen is qualified as an expert on finance. They contend, however, that she lacks expertise to opine on the senior loan secondary market because she has never traded in that market, she has never worked for a senior loan fund, and she has never been associated with LPC or LSTA. Defendants contend that being a generalist on loan markets is not good enough, that she must be a specialist as to the senior loan market in order to be able to provide useful testimony for the jury. This objection is without merit. Allen's educational background and the research background shown by her publications show that she is well versed on loans, factors and conditions that affect loan markets, and other aspects of the pertinent financial markets. Her report also exhibits an understanding of the senior loan market and how it functions. One need not have been a participant in a particular market in order to qualify as an academic expert who can provide useful testimony. Compare Crowley v. Chait, 322 F. Supp. 2d 530, 554-55 (D.N.J. 2004) (Fischel's academic and consulting expertise in economics qualified him to provide useful testimony related to insurance accounting, loss reserve, and management issues).

Defendants also contend that Allen's statistical evidence comparing LPC pricing to the Fund's valuation of loans would not be useful to the jury because it assumes LPC pricing is accurate.

This objection is without merit for two reasons.  First, Allen also provides competent and admissible evidence supporting that LPC pricing was reliable and readily available.  Second, even if she did not personally provide such support, the reliability of LPC pricing is a disputed issue of fact in this case.  The jury will decide the extent to which LPC/LSTA pricing information qualifies as reliable and readily available market quotations. In light of that finding, the jury will accordingly consider and apply Allen's testimony comparing the LPC pricing to the Fund's valuations.

This motion in limine will be denied in its entirety.

## 2. To Exclude the Eaton Vance Documents [143-1]

Eaton Vance is a senior loan fund unrelated to the Fund. A lawsuit is pending against Eaton Vance regarding their valuations of senior loans.  Some of the same attorneys represent the plaintiffs in both this case and the Eaton Vance case.  When deposed in the Van Kampen case, Taylor testified that monthly LSTA pricing information was not available to buy-side institutions like Van Kampen and Eaton Vance until September 1999.  After fact discovery closed in the Van Kampen case, Taylor was deposed in the Eaton Vance case.  At that time, Taylor corrected her testimony and stated that the reports were available to buy-side "founding" or "full" members as of July 1998.  Van Kampen did not become a full member of LSTA until 2000, but could have become a full member in 1998.  Eaton Vance was a full member in 1998 and therefore received the reports

beginning in 1998. Those reports were disclosed in discovery in the Eaton Vance case. In the Eaton Vance case, reliability studies were also disclosed in which Eaton Vance had compared LPC market prices to actual prices Eaton Vance had paid for senior loans. Both the reports and reliability study are included as plaintiffs exhibits in the Van Kampen case. The reliability study was considered by Allen in rendering her opinions. Defendants object to use of these documents on the ground that they were not properly disclosed in discovery in the Van Kampen case and on grounds of relevance.

While defendants had some notice of the existence of these documents prior to the time the pretrial order was prepared, plaintiffs do not dispute that they should have provided fuller notice and also do not dispute that the actual documents were not provided to defendants until defendants filed the present motion in limine. Plaintiffs indicate that the failure to provide the documents was an oversight, but also note that defendants were informed of the documents during the time the final pretrial order was being prepared and did not take the opportunity to request copies at that time. Defendants were also offered the opportunity to further depose Allen regarding these documents, but decided not to do so. Defendants do not dispute that they now have the documents and do not point to any manner in which the delayed disclosure has prejudiced their preparation for trial. The documents will not be barred based on failure to timely and adequately disclose them if the deficiencies were

harmless.  See Fed. R. Civ. P. 37(c)(1).  Here, there is no indication that defendants were prejudiced in any manner by the delays.  No sanction will be imposed.

Defendants' other objection is relevance.  Since the reports were available to entities like the Fund, the reports are relevant to the issue of whether there were readily available market quotations.  The reports will not be stricken as exhibits.  The reliability study represents a method for testing the accuracy of LPC pricing information and was relied upon one of plaintiffs' experts.  The studies are also relevant evidence.

For the foregoing reasons, this motion in limine will be denied.

### 3.  To Exclude the Testimony of Thomas Hudson [144-1]

Thomas Hudson has been a senior loan trader at Goldman Sachs and was on the Distressed Loan Committee of LSTA. Plaintiffs represent that they decided to use him as a witness after defendants proposed Meenan and DeLuca as witnesses. Plaintiffs intend to use Hudson to rebut all or some of the testimony of Meenan and DeLuca.  Plaintiffs do not dispute that Hudson was not previously disclosed in response to interrogatories.  However, neither had defendants expressly disclosed Meenan and DeLuca in response to interrogatories.  See § B(2), supra.  Unlike Hudson, though, Meenan and DeLuca had been mentioned during deposition testimony.  In any event, defendants have not been prejudiced by the delayed disclosure.  Hudson will

not be barred as a witness, but, if they desire, defendants may
depose Hudson within the next 45 days.

## 4.  To Exclude Evidence Of, or Reference To, the SEC Letters [145-1]

In November 1999, the Midwest Regional Office of the SEC
conducted an on-site inspection of Van Kampen.  The inspection
was not limited to the Fund, but it did include an examination of
valuation procedures used by the Fund.  Related to this
inspection, there was correspondence between Van Kampen officials
and SEC officials.  Defendants move to exclude from evidence
three letters from the SEC to Van Kampen, dated October 20, 1999,
March 28, 2000, and June 28, 2000.[11]  Plaintiffs contend all
three letters are admissible under Fed. R. Evid. 803(8).

In a letter dated September 1, 1999, Van Kampen's General
Counsel, A. Thomas Smith, wrote to the SEC's Chicago Branch Chief
of Investment Company Examinations.  This letter included a
lengthy explanation of Van Kampen's methods for valuing loans.[12]
In a letter dated October 20, 1999, which is one of the letters

---

[11]There are also four letters from Van Kampen to the SEC.
Plaintiffs point out that the motion does not raise any objection
to those letters.  In the final pretrial order, however,
defendants object to those letters as well.  See Pl. Exh. 3, 6,
8, 10.  Any issues that exist regarding the admissibility of the
letters written by Van Kampen officials would be distinct from
the Rule 803(8) issues raised regarding the letters from the SEC
that are the subject of the present motion.

[12]Neither side's brief attaches a copy of this letter.
The remainder of its content is not disclosed in the briefs and
neither side makes any representation as to what caused the
General Counsel to write this letter.  Presumably, it was a
response to a prior inquiry from the SEC.

that is a subject of this motion in limine, the SEC's Midwest Regional Office Assistant Director wrote to Smith confirming an October 18 conversation. The letter referred to the SEC's upcoming inspection regarding three SEC senior loan funds, including the Fund, which would begin November 1, and requested certain additional documents.

According to Smith's deposition testimony, the inspection lasted approximately one week. The inspection team interviewed Smith, the Fund's President and Portfolio Manager, and the Fund's Assistant Portfolio Manager. Records were also examined.

In January 2000, the Fund adopted the 3 x 3 by 100 screen and requested a meeting with the SEC to discuss it. This meeting took place on January 25, 2000 in Washington, D.C. With a letter dated February 1, 2000, Van Kampen sent additional documents to the SEC.

In a letter dated March 28, 2000, which is one of the letters that is a subject of this motion in limine, the SEC's Assistant Regional Director wrote to the Fund's President. The letter sets forth findings made during the November inspection. The SEC sets forth a number of deficiencies that were found with the pricing guidelines that were in effect as of November 1999 (the "Old Guidelines"). The inspection found a failure to adequately consider secondary market indications, including market quotations received directly from market makers or indirectly through LPC. A failure to consider fluctuations in spreads over the base rate of interest for pricing purposes was

also found.  In the letter, the Assistant Regional Director also commented on the new 3 x 3 x 100 pricing procedure (the "Proposed Guidelines") and found deficiencies.  It was found that the Proposed Guidelines too readily permitted the Adviser to override prices otherwise indicated by the 3 x 3 x 100 procedure.  Where 3 x 3 x 100 data was not available for pricing a loan, the Proposed Guidelines still failed to adequately consider spread when fair valuing a loan.  The letter also criticizes Van Kampen for finding that no Fund Board Member was on the Adviser's Pricing Committee that made fair value determinations.  The Board was also criticized for having made no attempt to compare fair valuation determinations with actual recoveries on distressed loans.

In a response letter dated April 27, 2000, Smith responded to the SEC's findings as to the Proposed Guidelines and the criticisms of the Board.  Smith noted new procedures that limited overrides of market indicators to one day, required daily approval by the Pricing Committee, and quarterly review by the Board.  He disagreed with the criticism regarding not adequately considering spreads on the ground that it required too complex an application to be feasibly implemented.  As to the Board criticisms, Smith noted that the Board would not be reviewing certain information on a quarterly basis and that it would be provided reports comparing distressed loan recoveries with their valuations.

The last letter to which defendants object is the SEC's
Regional Director's June 28, 2000 letter to Smith, which was a
response to Smith's April 27, 2000 letter.  The June letter notes
that the valuation techniques used by the three funds had been
discussed with the Division of Investment Management's Office of
Chief Counsel and that that office concurred with the views
expressed in the June letter.

First, the June letter reemphasized that, when available,
the law requires that market quotations be used to price
financial instruments and that the funds had to look to other
possible sources for quotations when LPC supplied quotes could
not be used.

> It is our understanding that the Funds do
> not seek other sources of market quotations
> whenever LPC-supplied quotes were deemed
> unreliable.  We were not shown any evidence
> that explained precisely why the LPC-supplied
> quotes did not reflect current market values
> other than the fact the quotes fell outside
> the predetermined parameters.  We also did not
> see any documentation evidencing that the Funds
> made a determination in these circumstances
> that reliable market quotations were not readily
> available.

June 28, 2000 SEC Letter at 2.

The letter again criticized the three funds' applications
of fair value methodology.

> In a majority of situations in which the
> Funds used fair value to price their portfolio
> instruments, the fair value methodology used
> resulted in such instruments being valued higher
> than the LPC-supplied quotes.  We also noted that
> in most circumstances when valuations are not
> based on LPC-supplied quotes, loans were fair
> valued at approximately par value.

The Funds have not provided us with any
analysis and documentation that supported the use
of such higher values.  . . . The only support
presented for valuation at par was that this
reflected the amount the Funds would receive if
instruments were held to maturity or the loan
prepaid.  As discussed in the Division of
Investment Management's December 8, 1999 letter
to the ICI, the Staff has consistently rejected a
policy of equating fair value with par value
absent evidence that an instrument could be sold
currently at approximately par.

Id.

The letter agreed that certain factors suggested by Van

Kampen could appropriately be considered when it was appropriate

to apply fair value methodology, but emphasized that these were

not the only factors to consider.  "All relevant factors" were to

be considered.

. . . The following issues suggest that all
relevant factors are not being considered in
using fair values to price certain of the Funds'
portfolio instruments:
   • The substantial difference that often exists
     between quotations provided by LPC and fair
     values used by the Funds in situations where
     Van Kampen's price discovery mechanism does
     not produce alternative market quotations
     that Van Kampen deems reliable.
   • The absence of any demonstrated analysis on
     an instrument-by-instrument basis supporting
     a valuation at approximately par value.

Id. at 3.

Rule 803(8) provides:

Records, reports, statements, or data
compilations, in any form, of public offices or
agencies, setting forth (A) the activities of the
office or agency, or (B) matters observed
pursuant to duty imposed by law as to which
matters there was a duty to report, excluding,
however, in criminal cases matters observed by

police officers and other law enforcement
personnel, or (C) in civil actions and
proceedings and against the Government in
criminal cases, factual findings resulting from
an investigation made pursuant to authority
granted by law, unless the sources of information
or other circumstances indicate lack of
trustworthiness.

Fed. R. Evid. 803(8).

Plaintiffs contend that the October 29, 1999 letter is
admissible under Rule 803(8)(A) and that the other two letters
are admissible under Rule 803(8)(C). The October letter is a
request for information that occurred prior to the November
inspection; it does not include any factual findings that would
bring it within the purview of subsection (C). The trustworth-
iness clause of Rule 803(8) still applies to subsection (A). <u>See</u>
<u>Nachtsheim v. Beech Aircraft Corp.</u>, 847 F.2d 1261, 1273 (7th Cir.
1988); <u>United States v. Koontz</u>, 143 F.3d 408, 412 (8th Cir.
1998); <u>Chapman v. San Francisco Newspaper Agency</u>, 2002 WL
31119944 *2 (N.D. Cal. Sept. 20, 2002); <u>United States v. May</u>,
18 M.J. 839, 842-43 (1984). The October 29 letter, however,
certainly is trustworthy as to what it is, a simple statement
confirming that additional documents had been requested. The
October 29 letter is nonhearsay in accordance with Rule
803(8)(A). Whether other grounds for excluding it exist will be
discussed below.

The other two letters contain findings based on the
November inspection. To be nonhearsay, they must satisfy the
criteria of Rule 803(8)(C), including that they do not have

indicia of lacking trustworthiness. If the threshold requirements of being factual findings resulting from an investigation made pursuant to authority granted by law are satisfied, trustworthiness is presumed and the burden is on the party opposing admission to show a lack of trustworthiness. Amtrust Inc. v. Larson, 388 F.3d 594, 599 (8th Cir. 2004); Bridgeway Corp. v. Citibank, 201 F.3d 134, 143 (2d Cir. 2000); Huff v. State of Illinois, 2003 WL 168630 *5 (N.D. Ill. Jan. 23, 2003); Klein v. Vanek, 86 F. Supp. 2d 812, 820 (N.D. Ill. 2000). Here, the letters contain factual findings[13] that were made following an SEC inspection performed pursuant to authority of law. Therefore, the findings are presumed to be trustworthy.

In evaluating trustworthiness, four nonexclusive factors set forth in the Advisory Committee Notes to Rule 803(8) are generally considered. See Coleman v. Home Depot, Inc., 306 F.3d 1333, 1342 (3d Cir. 2002); Klein, 86 F. Supp. 2d at 820. They are the timeliness of the investigation; the special skill or expertise of the official; whether a hearing was held; and

---

[13]Conclusions and opinions that are factual in nature may fall within the Rule 803(8)(C) exception. Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 162 (1988); United States v. Romo, 914 F.2d 889, 896 (7th Cir. 1990), cert. denied, 498 U.S. 1122 (1991); United States v. Peitz, 2002 WL 31101681 *5 (N.D. Ill. Sept. 20, 2002). However, legal conclusions of an agency will not be admitted under the Rule 803(8)(C) exception. Hines v. Brandon Steel Decks, Inc., 886 F.2d 299, 302-03 (11th Cir. 1989), cert. denied, 503 U.S. 971 (1992); Miranda-Ortiz v. Deming, 1998 WL 765161 *1 (S.D.N.Y. Oct. 29, 1998). To the extent any of the SEC letters contain legal conclusions; any admissible portions would be limited to those findings that are factual in nature. Cf. Peitz, 2002 WL 31101681 at *5.

possible motivational problems with the investigator. Additional
factors that have been considered include the finality of the
findings; the extent to which the findings are based on materials
that would not be admissible in evidence; the degree to which any
hearing complied with due process; the extent to which there is
an ascertainable record; the extent to which the findings
represent an implementation of a policy in contrast to findings
of fact; whether the findings incorporate findings of another
agency that may not have been trustworthy; and, if expert
opinions were involved, the extent to which the usual criteria
for such opinions was present. <u>Coleman</u>, 306 F.3d at 1342 n.4
(quoting <u>Zenith Radio Corp. v. Matsushita Electrical Industries
Co.</u>, 505 F. Supp. 1125, 1147 (E.D. Pa. 1980), <u>aff'd in part,
rev'd in part on other grounds</u>, <u>In re Japanese Electronic
Products Antitrust Litigation</u>, 723 F.2d 238 (3d Cir. 1983),
<u>rev'd</u>, <u>Matsushita Electrical Industrial Co. v. Zenith Radio
Corp.</u>, 475 U.S. 574 (1986)).

        Here, no questions are raised regarding the SEC's
motivation. The subject of the investigation was well within the
expertise of the SEC. The inspection was conducted in November
and the first letter was issued within a few months. Timeliness
is also satisfactory. Defendants contend there are indicia of a
lack of trustworthiness because no formal hearing was held and
the findings were made by the Midwest Regional Office without
ever being adopted by the Commission itself.

It is true that findings following a formal hearing with
full due process procedures are more likely to be found to be
trustworthy.  However, findings based on other investigative
procedures may still be admissible.  <u>Bank of Lexington & Trust
Co. v. Vining-Sparks Securities, Inc.</u>, 959 F.2d 606, 617 (6th
Cir. 1992); Michael H. Graham, <u>Federal Practice & Procedure</u>
§ 7049 at 498 n.24 (2d Interim Ed. 1997).  <u>See, e.g.</u>, <u>Coleman</u>,
306 F.3d at 1341-43 (determination letter based on EEOC
investigation); <u>Bank of Lexington</u>, 959 F.2d at 616-17 (letters of
caution from National Association of Securities Dealers); <u>United
States v. Peitz</u>, 2002 WL 31101681 *5 (N.D. Ill. Sept. 20, 2002)
(SEC action memorandum).  Here, there is nothing presented by
defendants to indicate that the SEC's inspection was not thorough
or adequate.  Although no hearing was held, the correspondence
shows the SEC provided Van Kampen with a number of opportunities
to provide additional documentation or evidence as well as
opportunities to argue that the three funds' valuation procedures
were adequate.  Defendants contend the inspection was not
intended to fully examine the Fund's valuation procedures because
one of the letters refers to the inspection as being pursuant to
§ 31 of the 1940 Act, 15 U.S.C. § 80a-30, which defendants
contend is an inspection to ensure that proper records are kept.
Although § 31(a) (15 U.S.C. § 80a-30(a)) requires that certain
records be maintained, the examination provided for in § 31(b)
(15 U.S.C. § 80a-30(b)) is not limited to an examination to
determine compliance with the recordkeeping requirement of

§ 31(a). "All records required to be maintained and preserved in accordance with subsection (a) of this section shall be subject at any time and from time to time to such reasonable periodic, special, and other examinations by the Commission, or any member or representative thereof, as the Commission may prescribe." 15 U.S.C. § 80a-30(b). The correspondence makes clear that the inspection was not intended merely to confirm that certain records were maintained. Defendants do not show that the SEC employed inspection procedures that raise questions as to the findings' trustworthiness.

Defendants also contend that the letters are untrustworthy because they were never adopted by the Commission itself. Where recommendations are being made to the Commission, findings made by SEC officials may be found to be untrustworthy if not adopted by the Commission. See Peitz, 2002 WL 31101681 at *5. That, however, is not the present situation. The Regional Office had not made any recommendation to the Commission. The investigative procedures that were employed had not reached a stage that required Commission approval. As the last letter indicated, the Regional Office did get the concurrence of the Chief Counsel's Office. The findings in the letters will not be found untrustworthy simply because they were not approved by the Commission.

There is nothing to support that the Regional Office's findings based on its inspection were untrustworthy. The presumption of trustworthiness remains intact. Therefore, in

accordance with Rule 803(8), the factual findings contained in the three letters are not hearsay. However, legal conclusions contained in the letters would not be admissible to prove the truth of the matters contained therein. Statements that the funds failed to use market quotations that were readily available would itself be an admissible factual statement. The additional statements that such conduct violated statutes or regulations would not be admissible.

Although factual findings in the letters are not excluded as hearsay, it still must be considered whether the findings should be excluded on other grounds. Statements that fall within a Rule 803 exception may still be excluded as unduly prejudicial under Rule 403 or as irrelevant. See Cooper v. Carl A. Nelson & Co., 211 F.3d 1008, 1018 (7th Cir. 2000); Klein, 86 F. Supp. 2d at 820.

Defendants argue that the present case involves misstatements of fact that violated § 11 whereas the letters address violations of § 2 of the 1940 Act which is not the issue in this case. As previously held, however, the legal conclusions regarding compliance with the 1940 Act are not parts of the letters that are nonhearsay under Rule 803(8)(C). Facts supporting possible violations of the 1940 Act, though, are the same facts that support misstatements or omissions in the prospectuses. Basically, some of the alleged misstatements in the prospectuses were that the Fund was following valuation procedures, ones that complied with statutory requirements, but

in actuality it was not.  These facts will be before the jury.
The jury would not be confused by being told that the SEC found
facts that are consistent with plaintiffs' allegations regarding
the Fund's actual valuation practices.  They will not be told
that the SEC found or indicated such practices violated the 1940
Act.

Defendants' other contention is that it would be unfairly
prejudicial to provide evidence showing that the SEC reached
conclusions that go to core issues that plaintiffs must prove to
the jury.  See Klein, 86 F. Supp. 2d at 820-21.  Defendants argue
the jury will have before it the same evidence that was before
the SEC plus more and that, without knowing the conclusions
reached by the SEC, the jury can conclude for itself whether
there were readily available market quotations that the Fund did
not adequately take into account when valuing its holdings.
There is case law supporting that it is within the trial court's
discretion to exclude Rule 803(8)(C) evidence on this ground.
See Tulloss v. Near North Montessori School, Inc., 776 F.2d 150,
153-54 (7th Cir. 1985); Klein, 86 F. Supp. 2d at 820-21.  See
also Young v. James Green Management, Inc., 327 F.3d 616, 624-25
(7th Cir. 2003).  Defendants do not cite any case holding that it
is necessarily an abuse of discretion to admit such evidence.
The Supreme Court has held that, as with expert and lay opinions
(see Fed. R. Evid. 704(a)), Rule 803(8)(C) evidence that goes to
ultimate issues may be admitted.  See Beech Aircraft, 488 U.S.
at 169-70.

Here, the jury will not simply be presented with evidence of the pricing information available to the Fund and then decide whether, contrary to representations in the prospectuses, there were readily available market quotations that were not used by the Fund in valuing loans or pertinent pricing information that was not considered when using fair value methods. Each side will also present experts who will opine as to whether such quotations or pricing information was available. In other words, even without the SEC letters, there will be experts opining as to some of the factual issues that must be decided by the jury. The SEC letters are analogous to having another expert's testimony regarding such ultimate issues, but an expert who is not biased by being connected to a particular party. Unlike the actual experts, the SEC letters will not be subject to cross examination. However, the parties will still be able to challenge the SEC's conclusions through the testimony of their own experts as well as in closing arguments.

The SEC letters apparently would also be relevant and admissible for another reason. Defendants will raise a business judgment defense based on their believing alleged misstatements in the prospectuses are actually true. The criticisms contained in the letters from the SEC, to the extent known by particular defendants and only as to prospectuses issued after such knowledge, would go to the question of those defendants' good faith beliefs regardless of whether the letters are admitted for the truth of the matters contained therein.

It is found that admission of the SEC letters would not
be unfairly prejudicial to defendants.  Therefore, in redacted
form as discussed above, none of the letters will be excluded
from evidence.

For the foregoing reasons, this motion in limine will be
granted in part and denied in part.  The letters will not be
excluded from evidence except that legal conclusions must be
redacted from the letters.  The parties are to meet in an attempt
to agree upon redacted versions of the letters.

### D. CONCLUSION

The parties previously attempted to settle this case with
the aid of a mediator, but could not reach an accord.  Perhaps,
in light of today's ruling, the parties will now be able to
settle the case.  Within one week, the parties shall contact each
other to discuss the possibility of settlement.  As a possible
aid in the process, this case will be referred to the assigned
magistrate judge to conduct settlement proceedings.  The parties
shall promptly contact the minute clerk of the assigned
magistrate judge to arrange for a date to appear before the
magistrate judge.

At the next status hearing, the parties shall report on
the possibility of settlement.

IT IS THEREFORE ORDERED that:

(1) Plaintiffs' Motion In Limine To Bar Evidence that
Traders Issued False Loan Pricing Data [138-1] is denied, but

without prejudice to objecting to Taylor's testimony at trial.

(2) Plaintiffs' Motion In Limine To Exclude the Testimony of Kevin Meenan and Anthony DeLuca [139-1] is granted in part and denied in part. Within 45 days, plaintiffs may depose Meenan and DeLuca.

(3) Plaintiffs' Motion In Limine To Exclude the Testimony and Report of Michael P. McAdams [140-1] is granted in part and denied in part. McAdams will not be permitted to testify as to (a) whether any actual valuation practice of the Fund is consistent with a description of the practice contained in a prospectus nor (b) whether any defendant acted in good faith or with some other type of intent.

(4) Plaintiffs' Motion In Limine To Exclude Testimony of Expert Witnesses Daniel R. Fischel and David J. Ross [141-1] is granted in part and denied in part. Fischel and Ross will be barred from testifying as to Opinion 1 (the effect of adverse market conditions on the Fund NAV) and defendants will be limited to using one expert to testify as to the remaining opinions contained in the Fischel/Ross Report.

(5) Plaintiffs' Motion In Limine To Preclude Evidence and Argument Concerning Dividends Paid by the Van Kampen Prime Rate Income Trust to Shareholders [142-1] is granted. The parties will not be permitted to present evidence as to the amount of dividends that the Fund paid nor will they be permitted to argue that any distribution of dividends affected the Fund's NAV or the amount of damages to be awarded in this case.

(6) Defendants' Motion In Limine To Exclude the Testimony and Report of Linda Allen [137-1] is denied.

(7) Defendants' Motion In Limine To Exclude the Eaton Vance Documents [143-1] is denied.

(8) Defendants' Motion In Limine To Exclude the Testimony of Thomas Hudson [144-1] is granted in part and denied in part. Within 45 days, defendants may depose Hudson.

(9) Defendants' Motion In Limine To Exclude Evidence Of, or Reference To, the SEC Letters [145-1] is granted in part and denied in part.  Legal conclusions must be redacted from the SEC letters.

(10) This case will be referred to the assigned magistrate judge to supervise settlement discussions.

(11) A status hearing before Judge Hart will be held on March 16, 2005 at 11:30 a.m.


ENTER:

William T. Hart

UNITED STATES DISTRICT JUDGE


DATED:   JANUARY  12 , 2005